## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **LAKE COUNTY PRESS, INC.**, an Illinois Corporation, <br><br> Plaintiff, <br><br> v. <br><br> **THOMAS MEITZLER**, an Illinois resident, and **THE GRAPHIC ARTS STUDIO, INC.**, an Illinois Corporation, <br><br> Defendants. | Civil Case No.: <br><br><br> **JURY TRIAL DEMANDED** |

### VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Lake County Press, Inc. (hereinafter, "LCP"), by and through its attorneys, Crowell & Moring LLP, brings this action against Defendants Thomas Meitzler (hereinafter, "Meitzler") and The Graphic Arts Studio, Inc. ("hereinafter, "GAS") (collectively, "Defendants") and pleading hypothetically and in the alternative allege as follows:

### NATURE OF THE ACTION

1. This is an action for injunctive relief and damages arising out of: (a) violation of the Defend Trade Secrets Act ("DTSA") by Defendants; (b) breach of an employment agreement between LCP and Defendant Meitzler, including, without limitation, Defendant Meitzler's violations of non-solicitation, non-compete, and confidentiality clauses in the agreement; (c) Defendant Meitzler's breach of his fiduciary duty and duty of loyalty to LCP; and (d) tortious interference with contractual relations by Defendant Meitzler and Defendant GAS.

2. LCP seeks to enjoin Defendants' current and future use of LCP's confidential, proprietary, and trade secret information and from soliciting LCP's clients and competing against LCP by using that information. LCP also seeks a return of its digital assets that Defendant Meitzler

1

has improperly taken over and to which LCP no longer has access and a preliminary and permanent injunction against either Defendant's use of such confidential, proprietary, and trade secret information and digital assets. LCP also seeks damages it has suffered because of Defendants' actions.

3. LCP is a printing company based in Waukegan, Illinois that was founded on September 1, 1970, as a small shop with one-color and two-color presses. (Exhibit A.) Over the last five decades, LCP has grown to be a recognized leader in print technology and offers a wide range of innovative solutions (both online and offline) to help brand owners resolve their challenges with multi-channel marketing, including by providing services in sophisticated multi-color printing, digital print-on-demand, web-to-print programs and in-house custom development of web/cloud-based messaging. (Exhibit B.) As a client-first company, LCP places significant value on its customer relationships, which include, without limitation, those in the graphic design community, advertising companies, and Fortune 500 companies worldwide. (*Id.*)

4. Defendant GAS is a printing company based in Barrington, Illinois. Defendant GAS offers a similar range of services as LCP and claims on its website to have "the latest technology/equipment to produce digital print on demand, including Grand Format and web to print, as well as in house mailing services." (Exhibit C.) Accordingly, Defendant GAS is a direct competitor of LCP.

5. Defendant Meitzler was an LCP Senior Vice President, Sales, between April 2, 2020 and through at least September 1, 2023. On September 1, 2023, Defendant Meitzler notified LCP that he was resigning and that his resignation was to be effective immediately. Shortly after Defendant Meitzler resigned, LCP learned that, without notice to LCP or LCP's authorization,

Meitzler changed the passwords to at least one of LCP's client portals with ▬ one of its most-valued customers, thereby blocking LCP's executives from access to this account.

6. Shortly after Defendant Meitzler's resignation, LCP's Executive Management Team ("EMT") learned that between July 18 and August 20, 2023, Defendant Meitzler had, without LCP's authorization, improperly accessed LCP's servers to download and create two backup files of his entire Outlook mailbox and all client folders, which includes LCP's confidential, proprietary, and trade secret information, including without limitation data regarding LCP's customers, pricing and history of quotations, orders and related information.

7. Upon information and belief, Defendant Meitzler solicited employment from Defendant GAS while he was employed by LCP and accepted an offer of employment with Defendant GAS even before his resignation was effective. Upon information and belief, Defendant Meitzler and Defendant GAS had already started and are continuing to use LCP's confidential, proprietary, and trade secret information that was improperly acquired by Defendant Meitzler to compete directly with LCP, thereby substantially threatening LCP's business and cause LCP to suffer irreparable harm, even before Meitzler tendered his resignation.

8. Before LCP's customer relationships and confidential information are further eroded, LCP seeks injunctive relief to protect the intrinsic value of its customer relationships, confidential, proprietary, and trade secret information, and goodwill. LCP respectfully requests this Court enjoin the Defendants from: (a) using or disclosing any of LCP's confidential, proprietary, and trade secret information, or aiding, assisting, or abetting any of these acts, and further violating any non-solicitation and non-competition or other, contractual obligations; (b) engaging in or participating in any activity designed to divert LCP's current or prospective clients; (c) retaining any inventory of documents or materials that contain LCP's confidential, proprietary,

and trade secret (by the return or verified destruction thereof); and order them to (d) return control of the converted electronic accounts to LCP; and (e) any other legal and equitable relief the Court deems appropriate.

9. LCP also seeks actual, incidental, compensatory, consequential, and punitive damages because of Defendants' actions and LCP's efforts to recover, preserve, and protect its confidential, proprietary, and trade secret information along with its long-standing customer relationships.

## **PARTIES**

10. Plaintiff LCP is an Illinois corporation with its principal place of business in Waukegan, Illinois.

11. Defendant Meitzler is a U.S. citizen who, is a citizen of the state of Illinois.

12. Defendant GAS is an Illinois corporation with its principal place of business in Barrington, Illinois.

## **JURISDICTION AND VENUE**

13. This Court has subject matter jurisdiction over this case pursuant to the Defend Trade Secrets Act (18 U.S.C. § 1832 *et seq.*) ("DTSA") and supplemental jurisdiction over all other claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

14. This Court has personal jurisdiction over Defendant Meitzler because Defendant Meitzler conducted business in the State of Illinois and committed tortious acts within the State, pursuant to 735 ILCS 5/2-209(a)(1)-(2). Defendant Meitzler is also an employee of LCP, which is an Illinois corporation, and in his employment agreement with LCP he stipulated that Illinois law applies in the event of a legal dispute.

15. This Court has personal jurisdiction over Defendant GAS because Defendant GAS is incorporated in the State of Illinois. Defendant GAS also conducts business in the State of Illinois and committed tortious acts within the State, pursuant to 735 ILCS 5/2-209(a)(1)-(2).

16. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this dispute occurred in this District.

**<u>FACTUAL BACKGROUND</u>**

17. LCP is an award-winning printing press company that helps brand owners achieve multi-channel goals both online and offline by providing various services, including sophisticated multi-color printing, digital print-on-demand, web-to-print programs and in-house custom development of web/cloud based messaging. (Exhibit B.) More recently, one of LCP's designs, the Wilco box set, competed with hundreds of entries around the world and won "Best of Show" for the 2019-2020 Mohawk Show Awards, an annual design competition that celebrates brilliant design, intelligent paper selection, and superior production. (Exhibit D.)

18. LCP puts enormous value on its customer relationships and to maintain the consistency of its high-quality services, LCP develops and maintains a large team of sales representatives and account executives, who are responsible for doing so, as well as helping grow new, prospective clients.

19. On April 1, 2020, Defendant Meitzler entered into an Executive Employment Agreement (hereinafter, "EEA") with LCP to serve as LCP's Senior Vice President of Sales. (Exhibit E.) Upon information and belief, prior to joining LCP, Defendant Meitzler served as an Owner and Executive Vice President of The P.H.I. Group, Inc. d/b/a eDOC Communications, Inc. (hereinafter, "eDOC") since December 2004. Upon information and belief, Defendant Meitzler

also served as an Account Executive for Defendant GAS between June 1995 and February 2000.

(Exhibit F.)

20. Section 2 of the EEA describes the duties that Defendant Meitzler owes LCP during the term of his employment and states:

> Employment Duties. During the Employment Term, Executive shall serve as Senior Vice President, Sales of the Company, subject to the terms and provisions of this Agreement and the direction and control of the Company's Executive Management Team ("EMT"). **Executive shall perform such services and assume such duties and responsibilities and exercise such authority consistent with his position as may be assigned by the EMT from time to time. Executive will devote his full working time and attention as well as his best efforts and abilities to the affairs of the Company and to the performance of his duties hereunder.**

21. Section 5 of the EEA contains restrictive covenants. Section 5(a) of the EEA states:

> Executive agrees that the relationships between the Company and its customers are of a **near permanent nature** and that the information which Executive will have access to is of a **confidential and proprietary nature** and the good will of the Company and **its customer relationships which the Executive will enjoy while employed by the Company are significant and valuable to the Compa**ny.

22. Section 5(b) of the EEA states:

> Executive agrees that **during the Employment Term and for a period of one (1) year after the termination of this Agreement**, provided that Executive's employment hereunder is terminated by the Company for Just Cause or by Executive for any reason, **Executive shall not, without the consent in writing of the Company, directly or indirectly**, either for himself or on behalf of any proprietorship, partnership, trust, corporation or limited liability company (whether as owner, partner, member, trustee, beneficiary, stockholder, officer, director, employee, consultant, lessor, lessee or otherwise) **solicit sales from, sell, or attempt or offer to sell products or services competitive with the products and services of the Company, including, without limitation**, document management services, offset printing, digital printing, variable imaging or digital asset management and **any services related to any of the foregoing, to customers of the Company to whom the Company sold such products and services prior to the effective date of such termination.**

6

23.    Section 5(c) of the EEA states:

Executive further agrees that he **will not, prior to the expiration of the Employment Term and following the termination of Executive's employment for any reason, for an additional period equal to the Employment Term of the Agreement plus one year, without obtaining the prior written consent of the Company, directly or indirectly, induce or influence, or seek to induce or influence, any person who is engaged by the Company as an employee, agent, independent contractor or otherwise, to terminate his or her employment or engagement, nor shall Executive directly or indirectly employ or engage or solicit for employment or engagement, or advise or recommend to any other person or entity** that such person or entity employ or engage or solicit for employment or engagement, any person or entity employed or engaged by the Company.

24.    Section 5(d) of the EEA states:

In the event Executive fails to abide by any of the provisions contained in this paragraph 6, any time period contained herein shall be extended by the period of time in which the Executive failed to abide the relevant provision(s).

25.    Section 5(e) of the EEA states:

**Employee agrees that following the termination of his employment, prior to accepting employment with, or agreeing to perform services for, any entity that competes with the Company and/or which directly or indirectly sells products or services the same or similar to the Company, he will notify the Company in writing of Employee's intentions** so as to provide the Company with the opportunity to assess whether Employee's employment or retention may potentially violate any provision of this Agreement.  Employee further agrees:

a) he will notify any entity to which Employee is offered employment or retention, of the existence of this Agreement; and

b) the Company may advise any employer or prospective employer of Employee of the existence of this Agreement.

26.    Section 6 of the EEA contains a confidentiality provision.  Section 6(a) of the EEA states:

**Executive understands and acknowledges, that by virtue of his position**

7

**with the Company, he may have access to certain Confidential Information** (as defined below), the disclosure or use of which may damage the Company or its Affiliates and is prohibited by the laws of any state or jurisdiction in which the Company conducts the Business.

27. Section 6(b) of the EEA states:

"Confidential Information" shall mean all information, including trade secrets, disclosed to Executive or known by Executive as a consequence of or through his employment by the Company, concerning the products or services offered by the Company or any of its Affiliates or any of their respective customers or vendors and which:

(i) has not been made generally available to the public, and is useful or of value to the Company's or its Affiliates' current or anticipated business, research or development activities or of those of any customer or supplier of the Company or its Affiliates; or

(ii) has been identified to Executive as confidential, either orally or in writing.

**Confidential Information shall include, without limitation**: computer programs; unpatented inventions, discoveries or improvements; **marketing, manufacturing, or organizational research and development, or business plans; sales forecasts**; personnel information, including the identity of other employees of the Company or its Affiliates, their responsibilities, competence, abilities, and compensation; manufacturing techniques; product formulations and product constructions; **pricing and financial information; current and prospective customer lists and information on customers or their employees; information concerning planned or pending acquisitions or divestitures; any proprietary or confidential information or business secret of the Company including, without limitation those relating to: the business, conduct, or operations of the Company, or of any of its respective customers; any methods, ways of doing business, etc., used in the engineering, manufacturing, production and/or marketing of the Company's products; the existence or betterment of, or possible new uses or applications for, any such products; or any of the Company's cost, pricing and purchasing information or policies; and information concerning purchases or sales of major equipment or property**.

28. Section 6(c) of the EEA states:

Confidential Information shall not include information which:

(i) is in or hereafter enters the public domain through no fault of Executive; or

8

(ii) is obtained by Executive from a third party having the legal right to use and disclose the same.

29. Section 6(d) of the EEA states:

**During and after the Employment Term, for the longest period of time permitted under applicable law, Executive shall keep secret, confidential, inviolate and shall not use or disclose** except as otherwise required by applicable law, (i) any Confidential Information except in furtherance of his duties for the Company, any (ii) **any Confidential Information except to officers or other employees of the Company when it is necessary, in the ordinary course of business, to do so**. **Executive** and each Affiliate of Executive (and if deceased, his personal representative) **shall, upon termination of this Agreement for any reason or immediately following a request therefor from the Company, return to the Company, without retaining copies, all tangible items which are, relate to, or which may or do contain Confidential Information.**

30. Section 8 of the EEA covers specific performance and states:

**Executive agrees that any violation by him of Sections 5, 6, or 7 of this Agreement would be highly injurious to the Company and its Affiliates and would cause irreparable harm to the Company and its Affiliates.** Accordingly, Executive consents and agrees that if he violates any provision of Sections 5, 6 or 7 of this Agreement, the Company and its Affiliates shall be entitled, in addition to any other rights and remedies that it may have, to specific performance and/or injunctive or other relief (without the requirement of posting of a bond or other security) in order to enforce, or prevent any continuing violation of, the provisions of this Section during the Restricted Period. Executive also recognizes that the time and scope limitations set forth in Section 5 and 6 are reasonable and are properly required for the protection of the Company . . .

31. Section 9 of the EEA covers termination. Section 9(a) provides that "Executive's employment with the Company: (a) shall terminate upon Executive's resignation, . . ." and Section 9(b)(ii) states that:

For purposes of this Agreement, **the effective date of Executive's termination** under Section 10 (a) shall be: . . . (ii) **if terminated as a result of Executive's resignation,** on the date specified in a written notice delivered by Executive to the Company, **which date shall be at least fifteen (15) business days following the date of such written notice**; . . .

32. Section 12(f) of the EEA covers remedies and states:

9

Each of the patties to this Agreement shall be entitled to enforce its rights under this Agreement specifically, to recover damages and costs caused by any breach of any provision of this Agreement and to exercise all other rights existing in such party's favor. **In the event of a dispute hereunder, the prevailing party's reasonable attorney's fees and costs shall be promptly reimbursed by the opposing party or patties in such dispute. The patties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief** in order to enforce or prevent any violations of the provisions of this Agreement.

33.     On April 2, 2020, Defendant Meizler and his co-shareholders of eDOC entered into an Asset Purchase Agreement (hereinafter, "APA") with LPC, whereby LCP purchased several assets (Exhibit G), including:

i.    "All unfilled sales orders and sales contracts, customer purchase orders or purchase contracts, quotations and bids to be performed on or after the Closing (as defined below) (the 'Unfilled Orders'), . . . ";

ii.   "**all customer lists, customer records and information relating to the customers of Seller** (such customers being referred the herein as 'eDOC Customers') . . . ";

34.     eDOC ceased doing business on or before April 2, 2020 and upon information and belief, eDOC was dissolved on February 11, 2022.  (Exhibit H.)

35.     Over the course of his employment with LCP, Defendant Meitzler gained access to a substantial amount of LCP's confidential, proprietary, and trade secret information, including information regarding LCP's customers, LCP's business/marketing strategies, customer preferences, and proprietary business methods.  Some of these business/marketing strategies and business methods are still in development and have not launched.

36.     On August 22, 2023, Defendant Meitzler approached Peter Douglas, LCP's Senior Vice President, Director of Sales and Marketing, to ask how LCP would feel if he were to become a broker and run some of his book of business through LCP.

10

37.     On August 28, 2023, Defendant Meitzler met with LCP's Executive Management Team ("EMT"), which included Peter Douglas, to discuss his book of business and declining sales. During that meeting, Meitzler again raised the issue of whether LCP would permit him to broker his business among LCP and other printers and set a September 1 deadline for LCP to decide. A follow up meeting for September 7 was set between LCP's EMT and Defendant Meitzler.

38.     On September 1, Defendant Meitzler submitted his resignation to LCP. On that same date, LCP's executives learned that Defendant Meitzler, without LCP's authorization, changed the password to LCP's client portal with one of its valued customers, ████, thereby blocking LCP from access to this data, including, *inter alia*, LCP sales and receivable data and ordering history, and on information and belief, redirected LCP's clients to GAS. Meitzler's actions misappropriated LCP's trade secrets and violated his EEA obligations.

39.     Upon receipt of Meitzler's purported resignation the LCP EMT tasked its IT manager to search LCP servers and backup for Meitzler history of any access and download or offload of LCP data.

40.     After receipt of Meitzler's purported resignation of September 1, 2023, LCP's executive management team learned that between July 18 and August 20, 2023, Defendant Meitzler, without LCP's authorization, accessed LCP's server to download and create two backup files of his Outlook mailbox and all client folders, for all email and related data and documents since April 2, 2020, including all related client data.

11



41. LCP conducts daily backups of all its data. All LCP e-mails are archived and therefore available to LCP employees. Defendant Meitzler's back-ups and download of his Outlook was clearly performed to take the data from LCP.

42. LCP learned on Tuesday, September 6, 2023 of Defendant Meitzler's direct solicitation of LCP clients when an LCP personnel received a Defendant Meitzler email to LCP ▮▮▮▮▮ which notified ▮▮ personnel that: Defendant Meitzler had resigned from LCP; Defendant Meitzler had accepted employment with Defendant GAS; Defendant Meitzler had already coordinated with ▮▮▮▮▮▮▮▮ and Defendant GAS to set up Defendant GAS as a vendor for ▮▮; Meitzler would be able to offer more aggressive pricing ▮▮ due to his employment with Defendant GAS. (Exhibit I.)

43. Upon information and belief, Defendant Meitzler solicited employment with GAS while he was employed by LCP in violation of the EEA and his obligations to LCP.

44. LCP's investigation into Defendant Meitzler's activities both pre- and post-his resignation is ongoing and, upon information and belief, is expected to reveal further examples of

Meitzler's violation of his fiduciary duty and duty of loyalty to LCP, his obligations not to compete and not to solicit employees or LCP clients or potential clients imposed by his EEA.

## COUNT I – VIOLATION OF DTSA AGAINST MEITZLER AND GAS

45.     LCP incorporates its allegations in Paragraphs 1- 44 above.

46.     During the course of his employment with LCP, Defendant Meitzler was provided access to substantial amounts of LCP's confidential, proprietary, and trade secret information that is of tremendous economic value to LCP and not available to the general public.  LCP invested significant amounts of time and money in gathering this information, which it uses in its business and not be easily acquired or duplicated by others, and LCP has taken reasonable measures to guard and protect its secrecy.

47.     Defendant Meitzler was legally and contractually obligated to protect the confidentiality of LCP's information.  However, months before his resignation, Defendant Meitzler wrongfully and intentionally, without authority, accessed LCP's protected server to misappropriate and take control over essential LCP confidential, proprietary, and trade secret information, including without limitation LCP's customer lists and client information, and absconded with this information.  Defendant Meitzler also changed the passwords to LCP's client portal for ██████ preventing LCP's access thereto.

48.     Defendant Meitzler has misappropriated and continues to misappropriate LCP's confidential, proprietary, and trade secret information.  His actions were improper because Defendant Meitzler was not a member of LCP's EMT and was never authorized by any LCP EMT member to transfer any assets or take over administrative rights on these portals, especially to the point of excluding LCP's EMT from accessing them.

49.     Based upon information and belief, Defendant Meitzler has engaged in other acts of misappropriation that will be revealed through discovery.

50.     By offering Defendant Meitzler a position at GAS while he was still employed as a Senior Vice President, Sales, at LCP and allowing Defendant Meitzler to use LCP's confidential, proprietary, and trade secret information in his new role to compete directly with LCP and steal LCP's clients, Defendant GAS has also misappropriated and is misappropriating LCP's confidential, proprietary, and trade secret information.  Upon information and belief, Defendant GAS has engaged in other acts of misappropriation that will be revealed through discovery.

51.     Unless Defendants are restrained, Defendants will continue to use, divulge, and/or disclose LCP's confidential, proprietary, and trade secret information.  As a direct result of Defendants actions, LCP suffered and continues to suffer irreparable harm for which there is no adequate remedy at law, and which will continue unless Defendants' actions are enjoined.

## COUNT II - BREACH OF CONTRACT AGAINST MEITZLER

52.     LCP incorporates its allegations in Paragraphs 1 -51 above.

53.     The EEA that Defendant Meitzler executed constitutes a valid and enforceable agreement.

54.     LCP performed all its duties and obligations that it agreed to and owed to Defendant Meitzler under the EEA.

55.     Under the EEA, Defendant Meitzler is prohibited from taking or using LCP's confidential information.

56.     Upon information and belief, Defendant Meitzler accepted an offer of employment with Defendant GAS and has taken LCP's confidential, proprietary, and trade secret information,

14

including information regarding LCP's customers, with him for the purpose of directly competing with LCP. This is a direct violation of Section 5(b) of the EEA.

57. In addition, Defendant Meitzler has violated Section 5(c) because he solicited the employment of Vinny Atella, LCP's Customer Service Account Manager, who submitted his resignation on September 1.

58. Defendant Meitzler's EEA stipulated that his voluntary resignation/termination would not be effective until at least fifteen days after submission to LCP and instead Meitzler purported to tender a notice effective the same day he tendered it in which directly violated Section 9 of the EEA.

59. Because of Defendant Meitzler's breaches and prospective breaches, LCP has been irreparably injured and continues to face irreparable injury. LCP is threatened with losing the value of its confidential, proprietary, and trade secret information and its relationships with various customers, along with income and goodwill, for which a remedy at law is inadequate.

60. This Court must enjoin and restrain Defendant Meitzler from further ongoing breach of his EEA duties and obligations. In addition to a remedy at equity, LCP seeks actual, incidental, compensatory, punitive, and consequential damages.

## COUNT III – BREACH OF FIDUCIARY DUTY AND LOYALTY AGAINST MEITZLER

61. LCP incorporates its allegations in Paragraphs 1-60 above.

62. Defendant Meitzler owed and still owes a fiduciary duty and duty of loyalty to LCP. Those duties include the obligation not to improperly retain and transfer LCP's assets, including customer lists, customer records, and all information relating to customers, and not to misappropriate or to use such property and information for his own benefit and enrichment.

15

63. During his employment with LCP, Defendant Meitzler solicited, accepted and started employment with Defendant GAS, a direct competitor of LCP, in violation of his fiduciary duty and duty of loyalty to LCP.

64. Upon information and belief, Defendant Meitzler's breaches were intentional, willful, and without just cause.

65. As a result of Defendant Meitzler's breach of the duty of loyalty to LCP, Meitzler has irreparably injured and continues to irreparably injure LCP. Meitzler's actions threaten LCP with loss of value of its confidential, proprietary, and trade secret information and its relationships with various customers, along with income and goodwill, for which a remedy at law is inadequate.

66. This Court must enjoin and restrain Defendant Meitzler must be from current or ongoing violations of his duties under the EEA. In addition to a remedy at equity, LCP seeks actual, incidental, compensatory, punitive, and consequential damages.

### COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AGAINST GAS

67. LCP incorporates its allegations in Paragraphs 1-66 above.

68. The EEA is a valid and enforceable contract. The EEA's confidentiality covenants and other provisions contained are reasonable in scope and duration and are reasonably necessary to protect LCP's legitimate protectable interests in its long-standing, well established and valuable customer relationships, its confidential information, and its goodwill.

69. Upon information and belief, Defendant GAS was aware of the EEA well before offering a position of employment to Defendant Meitzler.

70. Upon information and belief, despite having knowledge of the EEA, Defendant GAS intentionally induced, permitted, and incentivized Defendant Meitzler to violate his current

contractual obligations owed to LCP, without justification, in an effort to obtain LCP's confidential information and to unfairly compete with LCP.

71.     Upon information and belief, the intentional interference by Defendant GAS was malicious, unjustified and accomplished through wrongful means, including but not limited to, inducing, aiding or abetting Defendant Meitzler to breach his EEA with LCP, and an attempt to intentionally weaken LCP, in an effort to acquire business that would otherwise have been awarded to LCP.

72.     Defendant GAS' intentional interference has caused LCP to suffer irreparable and other significant injuries.   In addition to a remedy at equity, LCP seeks actual, incidental, compensatory, punitive, exemplary and consequential damages, and attorney's fees and costs.

**PRAYER FOR RELIEF**

**WHEREFORE**, Lake County Press, Inc. seeks judgment in its favor and an Order against Defendants Thomas Meitzler and The Graphic Arts Studio, Inc. that grants the following relief:

A.     Temporarily, preliminarily and permanently enjoining the Defendants and all parties in active concert or participation with them, from using or disclosing any of LCP's confidential and/or proprietary information;

B.     Temporarily, preliminarily and permanently enjoining the Defendants from engaging in or participating in any employment or activity, insomuch as such activity is directed to or designed to solicit or divert any of LCP's customers or potential customers that the Defendants contacted, targeted or serviced, or about which they had access to confidential information while in LCP's employ;

C.     Doing any other act or thing likely to damage LCP's goodwill and reputation;

17

D. Ordering Defendants and all parties in active concert or participation with them, to return to LCP all originals and copies of all files, devices and/or documents that contain or relate to LCP's confidential, proprietary, and trade secret information, including without limitation, access to all electronic accounts, as well as all computers, electronic media, PDA's and electronic storage devices;

E. Ordering Defendants and all parties in active concert or participation with them, to preserve all documents, data, and electronic information and to produce for inspection and imaging all computers and other electronic storage devices and email accounts belonging to, under the control of, accessible to, or operated by the Defendants;

F. Awarding LCP actual, incidental, compensatory, and consequential damages to be proven at trial;

G. Awarding LCP exemplary or punitive damages in an amount to be proven at trial due to Defendants' willful and malicious activities;

H. Awarding LCP its attorney's fees and costs incurred in this action, in view of the exceptional nature of Defendant Meitzler's deliberate infringing actions, in accordance with the Defend Trade Secrets Act;

I. Require Defendant Meitzler to return all money received as a result of his fraudulent inducement; and

J. Award LCP such further relief as the Court deems necessary and just

## **DEMAND FOR JURY TRIAL**

Pursuant to FRCP 38(b), LCP demands trial by jury in this action on all issues triable by jury.

Dated: September 12, 2023                    Respectfully submitted,


                                             By: /s/ *Judy K. He*

                                             Janet A. Pioli (IL Bar No. 6187783)
                                             Judy He (IL Bar No. 6327020)
                                             JPioli@crowell.com
                                             JHe@crowell.com
                                             Crowell & Moring LLP
                                             455 North Cityfront Plaza Drive, Suite 3600
                                             Chicago, IL 60611
                                             Telephone: (312) 321-4200

                                             Anne Li (pro hac vice forthcoming)
                                             ALi@crowell.com
                                             590 Madison Ave #20th
                                             New York, NY 10022
                                             Telephone: (212) 223-4000

                                             Evan B. Karnes II (IL Bar No. 3122359)
                                             Evan@KarnesLaw.com
                                             Karnes Law Chartered
                                             177 North State Street
                                             Chicago, IL 60601
                                             Telephone: (312) 629-8900

                                             *Attorneys for Plaintiff Lake County Press, Inc.*

## CERTIFICATION

Under penalties as provided by law pursuant to 28 U.S.C. § 1746, the undersigned certifies under penalty of perjury that the foregoing is true and correct, except as to matter therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.

Dated: September 11, 2023

Title: EVP / CFO

## CERTIFICATION

Under penalties as provided by law pursuant to 28 U.S.C. § 1746, the undersigned certifies under penalty of perjury that the foregoing is true and correct, except as to matter therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.

Dated: September 11, 2023

Title: _Sr. V.P Director of Sales_