## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **LAKE COUNTY PRESS, INC.**, an Illinois Corporation, <br><br>          Plaintiff/Counter-Defendant, <br>     v. <br> **THOMAS MEITZLER**, an Illinois resident, <br>         Defendant/Counter-Plaintiff, <br><br> and **THE GRAPHIC ARTS STUDIO, INC.**, an Illinois Corporation, <br><br>          Defendant. | Civil Case No.: 1:23-CV-10066 <br> Judge Lindsay C. Jenkins <br> Magistrate Judge Jeffrey T. Gilbert <br><br> **JURY TRIAL DEMANDED** |

## DEFENDANT THE GRAPHIC ARTS STUDIO, INC.'S ANSWER TO VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF AND AFFIRMATIVE DEFENSES

NOW COMES Defendant The Graphic Arts Studio, Inc. ("GAS"), by and through his attorneys, Buckley Fine, LLC, and for its Answer to Lake County Press, Inc.'s ("LCP") Verified Complaint for Injunctive and Other Relief, states as follows:

### NATURE OF THE ACTION

1.      This is an action for injunctive relief and damages arising out of: (a) violation of the Defend Trade Secrets Act ("DTSA") by Defendants; (b) breach of an employment agreement between LCP and Defendant Meitzler, including, without limitation, Defendant Meitzler's violations of non-solicitation, non-compete, and confidentiality clauses in the agreement; (c) Defendant Meitzler's breach of his fiduciary duty and duty of loyalty to LCP; and (d) tortious interference with contractual relations by Defendant Meitzler and Defendant GAS.

**ANSWER**: GAS admits that LCP seeks injunctive relief and damages against it and/or Thomas Meitzler ("Meitzler") for alleged violations of the DTSA, breach of Meitzler's employment

agreement, breach of fiduciary duty and loyalty, and tortious interference. GAS denies LCP is entitled to either injunctive relief or damages.

2.      LCP seeks to enjoin Defendants' current and future use of LCP's confidential, proprietary, and trade secret information and from soliciting LCP's clients and competing against LCP by using that information.  LCP also seeks a return of its digital assets that Defendant Meitzler has improperly taken over and to which LCP no longer has access and a preliminary and permanent injunction against either Defendant's use of such confidential, proprietary, and trade secret information and digital assets.  LCP also seeks damages it has suffered because of Defendants' actions.

**ANSWER**: GAS admits LCP seeks to enjoin its and Meitzler's alleged use of LCP's confidential, proprietary, and trade secret information. GAS denies that it has ever had access to any such information. GAS denies that it would ever accept any such information from Meitzler or anyone else. GAS denies LCP is entitled to either injunctive relief or damages. GAS lacks sufficient information and knowledge to admit or deny whether LCP has access to any digital assets that Meitzler allegedly took and, therefore, denies that allegation. GAS denies any remaining allegations in Paragraph 2.

3.      LCP is a printing company based in Waukegan, Illinois that was founded on September 1, 1970, as a small shop with one-color and two-color presses. (Exhibit A.)  Over the last five decades, LCP has grown to be a recognized leader in print technology and offers a wide range of innovative solutions (both online and offline) to help brand owners resolve their challenges with multi-channel marketing, including by providing services in sophisticated multi-color printing, digital print-on-demand, web-to-print programs and in-house custom development of web/cloud-based messaging.  (Exhibit B.)  As a client-first company, LCP places significant

value on its customer relationships, which include, without limitation, those in the graphic design community, advertising companies, and Fortune 500 companies worldwide. (*Id.*)

**ANSWER**: Exhibits A and B are documents that speak for themselves. GAS denies any allegations in Paragraph 3, and any inferences drawn therefrom, that are inconsistent with Exhibit A or Exhibit B.

4. Defendant GAS is a printing company based in Barrington, Illinois. Defendant GAS offers a similar range of services as LCP and claims on its website to have "the latest technology/equipment to produce digital print on demand, including Grand Format and web to print, as well as in house mailing services." (Exhibit C.) Accordingly, Defendant GAS is a direct competitor of LCP.

**ANSWER**: GAS admits it is a printing company based in Barrington, Illinois that offers a similar range of services as LCP. Exhibit C is a document that speaks for itself. GAS denies any allegations in Paragraph 4, and any inferences drawn therefrom, that are inconsistent with Exhibit C. GAS admits it offers services and products similar to those offered by LCP.

5. Defendant Meitzler was an LCP Senior Vice President, Sales, between April 2, 2020 and through at least September 1, 2023. On September 1, 2023, Defendant Meitzler notified LCP that he was resigning and that his resignation was to be effective immediately. Shortly after Defendant Meitzler resigned, LCP learned that, without notice to LCP or LCP's authorization, Meitzler changed the passwords to at least one of LCP's client portals with ▮▮▮▮ one of its most-valued customers, thereby blocking LCP's executives from access to this account.

**ANSWER**: On information and belief, GAS admits Meitzler was employed by LCP from April 1, 2020 through September 1, 2023. On information and belief, GAS admits that, on September 1, 2023, Meitzler notified LCP that has was resigning. GAS lacks knowledge sufficient to admit or

3

deny whether Meitzler changed the password to LCP's client portals with ▮▮▮▮, and therefore denies that allegation. GAS denies any remaining allegations in Paragraph 5.

6. Shortly after Defendant Meitzler's resignation, LCP's Executive Management Team ("EMT") learned that between July 18 and August 20, 2023, Defendant Meitzler had, without LCP's authorization, improperly accessed LCP's servers to download and create two backup files of his entire Outlook mailbox and all client folders, which includes LCP's confidential, proprietary, and trade secret information, including without limitation data regarding LCP's customers, pricing and history of quotations, orders and related information.

**ANSWER**: On information and belief, GAS admits Meitzler backed up his email and folders for customers he began servicing before his employment with LCP began. GAS denies the remaining allegations in Paragraph 6.

7. Upon information and belief, Defendant Meitzler solicited employment from Defendant GAS while he was employed by LCP and accepted an offer of employment with Defendant GAS even before his resignation was effective. Upon information and belief, Defendant Meitzler and Defendant GAS had already started and are continuing to use LCP's confidential, proprietary, and trade secret information that was improperly acquired by Defendant Meitzler to compete directly with LCP, thereby substantially threatening LCP's business and cause LCP to suffer irreparable harm, even before Meitzler tendered his resignation.

**ANSWER**: GAS admits it and Meitzler discussed the possibility of GAS providing employment to Meitzler while Meitzler was employed by LCP. GAS denies Meitzler accepted an offer of employment from GAS even before his resignation from LCP was effective. Further answering, Meitzler accepted an offer of employment from GAS that became effective after Meitzler resigned from LCP. GAS denies the remaining allegations in Paragraph 7.

8.      Before LCP's customer relationships and confidential information are further eroded, LCP seeks injunctive relief to protect the intrinsic value of its customer relationships, confidential, proprietary, and trade secret information, and goodwill.  LCP respectfully requests this Court enjoin the Defendants from: (a) using or disclosing any of LCP's confidential, proprietary, and trade secret information, or aiding, assisting, or abetting any of these acts, and further violating any non-solicitation and non-competition or other, contractual obligations; (b) engaging in or participating in any activity designed to divert LCP's current or prospective clients; (c) retaining any inventory of documents or materials that contain LCP's confidential, proprietary, and trade secret (by the return or verified destruction thereof); and order them to (d) return control of the converted electronic accounts to LCP; and (e) any other legal and equitable relief the Court deems appropriate.

**ANSWER**: GAS admits that LCP seeks injunctive relief. GAS denies it has ever had access to LCP's alleged confidential, proprietary, or trade secret information. GAS denies that it would ever accept any such information from Meitzler or anyone else. GAS denies LCP has the right to enforce any contractual obligations imposed upon Meitzler because, on information and belief, LCP materially breached Meitzler's employment agreement before Meitzler committed any alleged breach of the employment agreement. GAS lacks sufficient information and knowledge to admit or deny whether LCP lacks control of any electronic accounts Meitzler allegedly converted and, therefore, denies that allegation. GAS denies LCP is entitled to any legal or equitable relief. GAS denies any remaining allegations in Paragraph 8.

9.      LCP also seeks actual, incidental, compensatory, consequential, and punitive damages because of Defendants' actions and LCP's efforts to recover, preserve, and protect its

confidential, proprietary, and trade secret information along with its long-standing customer relationships.

**ANSWER**: GAS admits LCP is seeking actual, incidental, compensatory, consequential, and punitive damages. GAS denies LCP is entitled to any of the relief it seeks.

## PARTIES

10.     Plaintiff LCP is an Illinois corporation with its principal place of business in Waukegan, Illinois.

**ANSWER**: On information and belief, GAS admits the allegations in Paragraph 10.

11.     Defendant Meitzler is a U.S. citizen who, is a citizen of the state of Illinois.

**ANSWER**: GAS admits the allegations in Paragraph 11.

12.     Defendant GAS is an Illinois corporation with its principal place of business in Barrington, Illinois.

**ANSWER**: GAS admits the allegations in Paragraph 12.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this case pursuant to the Defend Trade Secrets Act (18 U.S.C. § 1832 *et seq.*) ("DTSA") and supplemental jurisdiction over all other claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

**ANSWER**: GAS denies the Court has subject matter jurisdiction because LCP does not state a claim under the DTSA. Therefore, the Court does not have supplemental jurisdiction over LCP's other claims.

14.     This Court has personal jurisdiction over Defendant Meitzler because Defendant Meitzler conducted business in the State of Illinois and committed tortious acts within the State, pursuant to 735 ILCS 5/2-209(a)(1)-(2). Defendant Meitzler is also an employee of LCP, which

is an Illinois corporation, and in his employment agreement with LCP he stipulated that Illinois law applies in the event of a legal dispute.

**ANSWER**: The allegations in Paragraph 15 are directed to Meitzler. To the extent an answer is required from GAS, GAS admits the Court has personal jurisdiction over Meitzler. GAS denies that Meitzler committed tortious acts in Illinois. GAS denies Meitzler is an employee of LCP. Meitzler's employment agreement speaks for itself. GAS denies any allegations in Paragraph 14, and any inferences drawn therefrom, that are inconsistent with Meitzler's employment agreement with LCP.

15. This Court has personal jurisdiction over Defendant GAS because Defendant GAS is incorporated in the State of Illinois. Defendant GAS also conducts business in the State of Illinois and committed tortious acts within the State, pursuant to 735 ILCS 5/2-209(a)(1)-(2).

**ANSWER**: GAS admits the Court has personal jurisdiction over it. GAS admits it is incorporated in the State of Illinois and that it conducts business in the State of Illinois. GAS denies the remaining allegations in Paragraph 15.

16. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this dispute occurred in this District.

**ANSWER**: GAS admits that venue in this District is appropriate.

## FACTUAL BACKGROUND

17. LCP is an award-winning printing press company that helps brand owners achieve multi-channel goals both online and offline by providing various services, including sophisticated multi-color printing, digital print-on-demand, web-to-print programs and in-house custom development of web/cloud based messaging. (Exhibit B.) More recently, one of LCP's designs, the Wilco box set, competed with hundreds of entries around the world and won "Best of Show"

for the 2019-2020 Mohawk Show Awards, an annual design competition that celebrates brilliant design, intelligent paper selection, and superior production. (Exhibit D.)

**ANSWER**: Exhibits B and D are documents that speak for themselves. GAS denies any allegations in Paragraph 17, and any inferences drawn therefrom, that are inconsistent with Exhibit B or Exhibit D.

18. LCP puts enormous value on its customer relationships and to maintain the consistency of its high-quality services, LCP develops and maintains a large team of sales representatives and account executives, who are responsible for doing so, as well as helping grow new, prospective clients.

**ANSWER**: GAS lacks sufficient information and knowledge to admit or deny the allegations in Paragraph 18 and, therefore, denies them.

19. On April 1, 2020, Defendant Meitzler entered into an Executive Employment Agreement (hereinafter, "EEA") with LCP to serve as LCP's Senior Vice President of Sales. (Exhibit E.) Upon information and belief, prior to joining LCP, Defendant Meitzler served as an Owner and Executive Vice President of The P.H.I. Group, Inc. d/b/a eDOC Communications, Inc. (hereinafter, "eDOC") since December 2004. Upon information and belief, Defendant Meitzler also served as an Account Executive for Defendant GAS between June 1995 and February 2000. (Exhibit F.)

**ANSWER**: GAS admits, on information and belief, that, on Meitzler entered into the EEA and that, prior to joining LCP, Meitzler was an owner and executive vice president of eDOC. GAS admits that Meitzler previously worked for in from the mid-1990s to the early 2000s.

20. Section 2 of the EEA describes the duties that Defendant Meitzler owes LCP during the term of his employment and states:

8

<u>Employment Duties.</u>  During the Employment Term, Executive shall serve as Senior Vice President, Sales of the Company, subject to the terms and provisions of this Agreement and the direction and control of the Company's Executive Management Team ("EMT").  **Executive shall perform such services and assume such duties and responsibilities and exercise such authority consistent with his position as may be assigned by the EMT from time to time.  Executive will devote his full working time and attention as well as his best efforts and abilities to the affairs of the Company and to the performance of his duties hereunder.**

**ANSWER**: The EEA is a document that speaks for itself. GAS denies any allegations in Paragraph 20, and any inferences drawn therefrom, that are inconsistent with the language in Section 2 of the EEA.

21.　　Section 5 of the EEA contains restrictive covenants.  Section 5(a) of the EEA states:

Executive agrees that the relationships between the Company and its customers are of a **near permanent nature** and that the information which Executive will have access to is of a **confidential and proprietary nature** and the good will of the Company and **its customer relationships which the Executive will enjoy while employed by the Company are significant and valuable to the Company.**

**ANSWER**: The EEA is a document that speaks for itself. GAS denies any allegations in Paragraph 21, and any inferences drawn therefrom, that are inconsistent with the language in Section 5(a) of the EEA.

22.　　Section 5(b) of the EEA states:

Executive agrees that **during the Employment Term and for a period of one (1) year after the termination of this Agreement**, provided that Executive's employment hereunder is terminated by the Company for Just Cause or by Executive for any reason, **Executive shall not, without the consent in writing of the Company, directly or indirectly**, either for himself or on behalf of any proprietorship, partnership, trust, corporation or limited liability company (whether as owner, partner, member, trustee, beneficiary, stockholder, officer, director, employee, consultant, lessor, lessee or otherwise) **solicit sales from, sell, or attempt or offer to sell products or services competitive with the products and services of the Company, including, without limitation**, document management services, offset printing, digital printing, variable

9

imaging or digital asset management and **any services related to any of the foregoing, to customers of the Company to whom the Company sold such products and services prior to the effective date of such termination**.

**ANSWER**: The EEA is a document that speaks for itself. GAS denies any allegations in Paragraph 22, and any inferences drawn therefrom, that are inconsistent with the language in Section 5(b) of the EEA.

23.     Section 5(c) of the EEA states:

Executive further agrees that he **will not, prior to the expiration of the Employment Term and following the termination of Executive's employment for any reason, for an additional period equal to the Employment Term of the Agreement plus one year, without obtaining the prior written consent of the Company, directly or indirectly, induce or influence, or seek to induce or influence, any person who is engaged by the Company as an employee, agent, independent contractor or otherwise, to terminate his or her employment or engagement, nor shall Executive directly or indirectly employ or engage or solicit for employment or engagement, or advise or recommend to any other person or entity** that such person or entity employ or engage or solicit for employment or engagement, any person or entity employed or engaged by the Company.

**ANSWER**: The EEA is a document that speaks for itself. GAS denies any allegations in Paragraph 23, and any inferences drawn therefrom, that are inconsistent with the language in Section 5(c) of the EEA.

24.     Section 5(d) of the EEA states:

In the event Executive fails to abide by any of the provisions contained in this paragraph 6, any time period contained herein shall be extended by the period of time in which the Executive failed to abide the relevant provision(s).

**ANSWER**: The EEA is a document that speaks for itself. GAS denies any allegations in Paragraph 24, and any inferences drawn therefrom, that are inconsistent with the language in Section 5(d) of the EEA.

25.     Section 5(e) of the EEA states:

> **Employee agrees that following the termination of his employment, prior to accepting employment with, or agreeing to perform services for, any entity that competes with the Company and/or which directly or indirectly sells products or services the same or similar to the Company, he will notify the Company in writing of Employee's intentions** so as to provide the Company with the opportunity to assess whether Employee's employment or retention may potentially violate any provision of this Agreement.  Employee further agrees:
>
> a)     he will notify any entity to which Employee is offered employment or retention, of the existence of this Agreement; and
>
> b)     the Company may advise any employer or prospective employer of Employee of the existence of this Agreement.

**ANSWER**: The EEA is a document that speaks for itself. GAS denies any allegations in Paragraph 25, and any inferences drawn therefrom, that are inconsistent with the language in Section 5(e) of the EEA.

26.     Section 6 of the EEA contains a confidentiality provision.  Section 6(a) of the EEA states:

> **Executive understands and acknowledges, that by virtue of his position with the Company, he may have access to certain Confidential Information** (as defined below), the disclosure or use of which may damage the Company or its Affiliates and is prohibited by the laws of any state or jurisdiction in which the Company conducts the Business.

**ANSWER**: The EEA is a document that speaks for itself. GAS denies any allegations in Paragraph 26, and any inferences drawn therefrom, that are inconsistent with the language in Section 6(a) of the EEA.

27.     Section 6(b) of the EEA states:

> "Confidential Information" shall mean all information, including trade secrets, disclosed to Executive or known by Executive as a consequence of or through his employment by the Company, concerning the products or services offered by the Company or any of its Affiliates or any of their respective customers or vendors and which:

11

(i) has not been made generally available to the public, and is useful or of value to the Company's or its Affiliates' current or anticipated business, research or development activities or of those of any customer or supplier of the Company or its Affiliates; or

(ii) has been identified to Executive as confidential, either orally or in writing.

**Confidential Information shall include, without limitation**: computer programs; unpatented inventions, discoveries or improvements; **marketing, manufacturing, or organizational research and development, or business plans; sales forecasts**; personnel information, including the identity of other employees of the Company or its Affiliates, their responsibilities, competence, abilities, and compensation; manufacturing techniques; product formulations and product constructions; **pricing and financial information; current and prospective customer lists and information on customers or their employees; information concerning planned or pending acquisitions or divestitures; any proprietary or confidential information or business secret of the Company including, without limitation those relating to: the business, conduct, or operations of the Company, or of any of its respective customers; any methods, ways of doing business, etc., used in the engineering, manufacturing, production and/or marketing of the Company's products; the existence or betterment of, or possible new uses or applications for, any such products; or any of the Company's cost, pricing and purchasing information or policies; and information concerning purchases or sales of major equipment or property**.

**ANSWER**: The EEA is a document that speaks for itself. GAS denies any allegations in Paragraph 27, and any inferences drawn therefrom, that are inconsistent with the language in Section 6(b) of the EEA.

28. Section 6(c) of the EEA states:

Confidential Information shall not include information which:

(i) is in or hereafter enters the public domain through no fault of Executive; or
(ii) is obtained by Executive from a third party having the legal right to use and disclose the same.

12

**ANSWER**: The EEA is a document that speaks for itself. GAS denies any allegations in Paragraph 28, and any inferences drawn therefrom, that are inconsistent with the language in Section 6(c) of the EEA.

29.     Section 6(d) of the EEA states:

> **During and after the Employment Term, for the longest period of time permitted under applicable law, Executive shall keep secret, confidential, inviolate and shall not use or disclose** except as otherwise required by applicable law, (i) any Confidential Information except in furtherance of his duties for the Company, any (ii) **any Confidential Information except to officers or other employees of the Company when it is necessary, in the ordinary course of business, to do so**. **Executive** and each Affiliate of Executive (and if deceased, his personal representative) **shall, upon termination of this Agreement for any reason or immediately following a request therefor from the Company, return to the Company, without retaining copies, all tangible items which are, relate to, or which may or do contain Confidential Information.**

**ANSWER**: The EEA is a document that speaks for itself. GAS denies any allegations in Paragraph 29, and any inferences drawn therefrom, that are inconsistent with the language in Section 6(d) of the EEA.

30.     Section 8 of the EEA covers specific performance and states:

> **Executive agrees that any violation by him of Sections 5, 6, or 7 of this Agreement would be highly injurious to the Company and its Affiliates and would cause irreparable harm to the Company and its Affiliates**. Accordingly, Executive consents and agrees that if he violates any provision of Sections 5, 6 or 7 of this Agreement, the Company and its Affiliates shall be entitled, in addition to any other rights and remedies that it may have, to specific performance and/or injunctive or other relief (without the requirement of posting of a bond or other security) in order to enforce, or prevent any continuing violation of, the provisions of this Section during the Restricted Period. Executive also recognizes that the time and scope limitations set forth in Section 5 and 6 are reasonable and are properly required for the protection of the Company . . .

**ANSWER**: The EEA is a document that speaks for itself. GAS denies any allegations in Paragraph 30, and any inferences drawn therefrom, that are inconsistent with the language in Section 8 of the EEA.

31. Section 9 of the EEA covers termination. Section 9(a) provides that "Executive's employment with the Company: (a) shall terminate upon Executive's resignation, . . ." and Section 9(b)(ii) states that:

> For purposes of this Agreement, **the effective date of Executive's termination** under Section 10 (a) shall be: . . . (ii) **if terminated as a result of Executive's resignation,** on the date specified in a written notice delivered by Executive to the Company, **which date shall be at least fifteen (15) business days following the date of such written notice**; . . .

**ANSWER**: The EEA is a document that speaks for itself. GAS denies any allegations in Paragraph 31, and any inferences drawn therefrom, that are inconsistent with the language in Sections 9(a) and 9(b)(ii) of the EEA.

32. Section 12(f) of the EEA covers remedies and states:

> Each of the patties to this Agreement shall be entitled to enforce its rights under this Agreement specifically, to recover damages and costs caused by any breach of any provision of this Agreement and to exercise all other rights existing in such party's favor. **In the event of a dispute hereunder, the prevailing party's reasonable attorney's fees and costs shall be promptly reimbursed by the opposing party or patties in such dispute. The patties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief** in order to enforce or prevent any violations of the provisions of this Agreement.

**ANSWER**: The EEA is a document that speaks for itself. GAS denies any allegations in Paragraph 32, and any inferences drawn therefrom, that are inconsistent with the language in Section 12(f) of the EEA.

14

33. On April 2, 2020, Defendant Meizler and his co-shareholders of eDOC entered into an Asset Purchase Agreement (hereinafter, "APA") with LPC, whereby LCP purchased several assets (Exhibit G), including:

    i. "All unfilled sales orders and sales contracts, customer purchase orders or purchase contracts, quotations and bids to be performed on or after the Closing (as defined below) (the 'Unfilled Orders'), . . . ";

    ii. "**all customer lists, customer records and information relating to the customers of Seller** (such customers being referred the herein as 'eDOC Customers') . . . ";

**ANSWER**: The APA is a document that speaks for itself. GAS denies any allegations in Paragraph 33, and any inferences drawn therefrom, that are inconsistent with the APA's provisions.

34. eDOC ceased doing business on or before April 2, 2020 and upon information and belief, eDOC was dissolved on February 11, 2022. (Exhibit H.)

**ANSWER**: GAS lacks knowledge sufficient to admit or deny when eDOC ceased doing business and, therefore, denies that allegation. Exhibit H is a document that speaks for itself. GAS denies any allegations in Paragraph 34, and any inferences drawn therefrom, that are inconsistent with Exhibit H.

35. Over the course of his employment with LCP, Defendant Meitzler gained access to a substantial amount of LCP's confidential, proprietary, and trade secret information, including information regarding LCP's customers, LCP's business/marketing strategies, customer preferences, and proprietary business methods. Some of these business/marketing strategies and business methods are still in development and have not launched.

**ANSWER**: GAS lacks sufficient information and knowledge to admit or deny the allegations in Paragraph 35 and, therefore, denies them.

36. On August 22, 2023, Defendant Meitzler approached Peter Douglas, LCP's Senior Vice President, Director of Sales and Marketing, to ask how LCP would feel if he were to become a broker and run some of his book of business through LCP.

**ANSWER**: GAS lacks sufficient information and knowledge to admit or deny the allegations in Paragraph 36 and, therefore, denies them.

37. On August 28, 2023, Defendant Meitzler met with LCP's Executive Management Team ("EMT"), which included Peter Douglas, to discuss his book of business and declining sales. During that meeting, Meitzler again raised the issue of whether LCP would permit him to broker his business among LCP and other printers and set a September 1 deadline for LCP to decide. A follow up meeting for September 7 was set between LCP's EMT and Defendant Meitzler.

**ANSWER:** GAS lacks sufficient information and knowledge to admit or deny the allegations in Paragraph 37 and, therefore, denies them.

38. On September 1, Defendant Meitzler submitted his resignation to LCP. On that same date, LCP's executives learned that Defendant Meitzler, without LCP's authorization, changed the password to LCP's client portal with one of its valued customers, ▮▮▮, thereby blocking LCP from access to this data, including, *inter alia*, LCP sales and receivable data and ordering history, and on information and belief, redirected LCP's clients to GAS. Meitzler's actions misappropriated LCP's trade secrets and violated his EEA obligations.

**ANSWER:** On information and belief, GAS admits that, on September 1, 2023, Meitzler submitted his resignation to LCP. GAS lacks sufficient information and knowledge to admit or deny whether Meitzler changed the password to LCP's client portal with ▮▮▮ and the effect of any such password change and, therefore, denies those allegations. GAS lacks sufficient information and knowledge to admit or deny whether Meitzler's alleged actions misappropriated

16

LCP's trade secrets and, therefore, denies those allegations. GAS denies any remaining allegations in Paragraph 38.

39. Upon receipt of Meitzler's purported resignation the LCP EMT tasked its IT manager to search LCP servers and backup for Meitzler history of any access and download or offload of LCP data.

**ANSWER**: GAS lacks sufficient information and knowledge to admit or deny the allegations in Paragraph 39 and, therefore, denies them.

40. After receipt of Meitzler's purported resignation of September 1, 2023, LCP's executive management team learned that between July 18 and August 20, 2023, Defendant Meitzler, without LCP's authorization, accessed LCP's server to download and create two backup files of his Outlook mailbox and all client folders, for all email and related data and documents since April 2, 2020, including all related client data.

**ANSWER**: On information and belief, GAS admits Meitzler backed up his email and folders for customers he began servicing before his employment with LCP began. GAS denies any remaining allegations in Paragraph 40.

41. LCP conducts daily backups of all its data. All LCP e-mails are archived and therefore available to LCP employees. Defendant Meitzler's back-ups and download of his Outlook was clearly performed to take the data from LCP.

**ANSWER**: GAS lacks sufficient information and knowledge to admit or deny the allegations in Paragraph 41 and, therefore, denies them.

42. LCP learned on Tuesday, September 6, 2023 of Defendant Meitzler's direct solicitation of LCP clients when an LCP personnel received a Defendant Meitzler email to LCP client ███ which notified ███ personnel that: Defendant Meitzler had resigned from LCP;

17

Defendant Meitzler had accepted employment with Defendant GAS; Defendant Meitzler had already coordinated with ██ purchasing personnel and Defendant GAS to set up Defendant GAS as a vendor for ██; Meitzler would be able to offer more aggressive pricing to ██ due to his employment with Defendant GAS.  (Exhibit I.)

**ANSWER:** Exhibit I is a document that speaks for itself. GAS denies any allegations in Paragraph 42, and any inferences drawn therefrom, that are inconsistent with Exhibit I.

43.     Upon information and belief, Defendant Meitzler solicited employment with GAS while he was employed by LCP in violation of the EEA and his obligations to LCP.

**ANSWER**: GAS admits that it discussed the possibility of employing Meitzler while Meitzler was employed by LCP. To the extent discussing employment with Meitzler could have violated the EEA, GAS denies LCP has the right to enforce any of the obligations imposed upon Meitzler under the EEA because, on information and belief, LCP materially breached the EEA before Meitzler committed any alleged breach of the EEA.

44.     LCP's investigation into Defendant Meitzler's activities both pre- and post-his resignation is ongoing and, upon information and belief, is expected to reveal further examples of Meitzler's violation of his fiduciary duty and duty of loyalty to LCP, his obligations not to compete and not to solicit employees or LCP clients or potential clients imposed by his EEA.

**ANSWER**: GAS lacks sufficient information and knowledge to admit or deny whether LCP is conducting any investigation identified in Paragraph 44 and, therefore, denies those allegations. GAS denies LCP has the right to enforce any of the obligations imposed upon Meitzler under the EEA or any claimed fiduciary duty of loyalty because LCP materially breached the EEA before Meitzler committed any alleged breach of the EEA.

18

## COUNT I – VIOLATION OF DTSA AGAINST MEITZLER AND GAS

45.     LCP incorporates its allegations in Paragraphs 1- 44 above.

**ANSWER**: GAS incorporates his Answers in Paragraphs 1-44 above.

46.     During the course of his employment with LCP, Defendant Meitzler was provided access to substantial amounts of LCP's confidential, proprietary, and trade secret information that is of tremendous economic value to LCP and not available to the general public.  LCP invested significant amounts of time and money in gathering this information, which it uses in its business and not be easily acquired or duplicated by others, and LCP has taken reasonable measures to guard and protect its secrecy.

**ANSWER**: GAS lacks sufficient information and knowledge to admit or deny the allegations in Paragraph 46 and, therefore, denies them.

47.     Defendant Meitzler was legally and contractually obligated to protect the confidentiality of LCP's information.  However, months before his resignation, Defendant Meitzler wrongfully and intentionally, without authority, accessed LCP's protected server to misappropriate and take control over essential LCP confidential, proprietary, and trade secret information, including without limitation LCP's customer lists and client information, and absconded with this information.  Defendant Meitzler also changed the passwords to LCP's client portal for ▇▇▇, preventing LCP's access thereto.

**ANSWER**: On information and belief, GAS denies the allegations in Paragraph 47.

48.     Defendant Meitzler has misappropriated and continues to misappropriate LCP's confidential, proprietary, and trade secret information.  His actions were improper because Defendant Meitzler was not a member of LCP's EMT and was never authorized by any LCP EMT

member to transfer any assets or take over administrative rights on these portals, especially to the point of excluding LCP's EMT from accessing them.

**ANSWER**: On information and belief, GAS denies the allegations in Paragraph 48.

49.     Based upon information and belief, Defendant Meitzler has engaged in other acts of misappropriation that will be revealed through discovery.

**ANSWER**: On information and belief, GAS denies the allegations in Paragraph 49.

50.     By offering Defendant Meitzler a position at GAS while he was still employed as a Senior Vice President, Sales, at LCP and allowing Defendant Meitzler to use LCP's confidential, proprietary, and trade secret information in his new role to compete directly with LCP and steal LCP's clients, Defendant GAS has also misappropriated and is misappropriating LCP's confidential, proprietary, and trade secret information.  Upon information and belief, Defendant GAS has engaged in other acts of misappropriation that will be revealed through discovery.

**ANSWER**: GAS denies the allegations in Paragraph 50.

51.     Unless Defendants are restrained, Defendants will continue to use, divulge, and/or disclose LCP's confidential, proprietary, and trade secret information.  As a direct result of Defendants actions, LCP suffered and continues to suffer irreparable harm for which there is no adequate remedy at law, and which will continue unless Defendants' actions are enjoined.

**ANSWER**: GAS denies the allegations in Paragraph 51.

WHEREFORE, Defendant The Graphic Arts Studio, Inc. respectfully requests that this Court denies the relief Plaintiff Lake County Press, Inc. seeks in Count I of its Verified Complaint, enters Judgment in The Graphic Arts Studio, Inc.'s favor, and awards all other relief to The Graphic Arts Studio, Inc. that it deems just, equitable and proper.

20

## COUNT II - BREACH OF CONTRACT AGAINST MEITZLER

52.    LCP incorporates its allegations in Paragraphs 1 -51 above.

**ANSWER**: The allegations in Count II are not directed to GAS. To the extent GAS is required to answer them, GAS incorporates its Answers in Paragraphs 1-51 above.

53.    The EEA that Defendant Meitzler executed constitutes a valid and enforceable agreement.

**ANSWER**: The allegations in Count II are not directed to GAS. To the extent GAS is required to answer the allegations in Paragraph 53, GAS admits the EEA is valid and enforceable with respect to Meitzler's rights. GAS denies LCP has the right to enforce any of the obligations imposed upon Meitzler under the EEA because, on information and belief, LCP materially breached the EEA before Meitzler committed any alleged breach of the EEA.

54.    LCP performed all its duties and obligations that it agreed to and owed to Defendant Meitzler under the EEA.

**ANSWER**: The allegations in Count II are not directed to GAS. To the extent GAS is required to answer the allegations in Paragraph 54, on information and belief, for the reasons asserted in Meitzler's Affirmative Defenses and Counterclaim, GAS denies them.

55.    Under the EEA, Defendant Meitzler is prohibited from taking or using LCP's confidential information.

**ANSWER**: The allegations in Count II are not directed to GAS. To the extent GAS is required to answer the allegations in Paragraph 55, the EEA is a document that speaks for itself. GAS denies any allegations in Paragraph 55, and any inferences drawn therefrom, that are inconsistent with the language in the EEA. Further answering, GAS denies LCP has the right to enforce any of the

21

obligations imposed upon Meitzler under the EEA because, on information and belief, LCP materially breached the EEA before Meitzler committed any alleged breach of the EEA.

56. Upon information and belief, Defendant Meitzler accepted an offer of employment with Defendant GAS and has taken LCP's confidential, proprietary, and trade secret information, including information regarding LCP's customers, with him for the purpose of directly competing with LCP. This is a direct violation of Section 5(b) of the EEA. Meitzler denies LCP has the right to enforce any of the obligations imposed upon Meitzler under the EEA because LCP materially breached the EEA before Meitzler committed any alleged breach of the EEA.

**ANSWER**: The allegations in Count II are not directed to GAS. To the extent GAS is required to answer the allegations in Paragraph 56, GAS admits Meitzler accepted an offer of employment with GAS. On information and belief, GAS denies Meitzler ever had access to any of LCP's confidential, proprietary, or trade secret information. GAS denies LCP has the right to enforce any of the obligations imposed upon Meitzler under the EEA because, on information and belief, LCP materially breached the EEA before Meitzler committed any alleged breach of the EEA.

57. In addition, Defendant Meitzler has violated Section 5(c) because he solicited the employment of Vinny Atella, LCP's Customer Service Account Manager, who submitted his resignation on September 1.

**ANSWER**: The allegations in Count II are not directed to GAS. To the extent GAS is required to answer the allegations in Paragraph 57, GAS admits Meitzler solicited the employment of Vinny Atella. GAS denies LCP has the right to enforce any of the obligations imposed upon Meitzler under the EEA because, on information and belief, LCP materially breached the EEA before Meitzler committed any alleged breach of the EEA.

58.     Defendant Meitzler's EEA stipulated that his voluntary resignation/termination would not be effective until at least fifteen days after submission to LCP and instead Meitzler purported to tender a notice effective the same day he tendered it in which directly violated Section 9 of the EEA.

**ANSWER**: The allegations in Count II are not directed to GAS. To the extent GAS is required to answer the allegations in Paragraph 57, the EEA is a document that speaks for itself. GAS denies any allegations in Paragraph 58, and any inferences drawn therefrom, that are inconsistent with the language in Section 9 of the EEA. Further answering, GAS denies LCP has the right to enforce any of the obligations imposed upon Meitzler under the EEA because, on information and belief, LCP materially breached the EEA before Meitzler committed any alleged breach of the EEA.

59.     Because of Defendant Meitzler's breaches and prospective breaches, LCP has been irreparably injured and continues to face irreparable injury. LCP is threatened with losing the value of its confidential, proprietary, and trade secret information and its relationships with various customers, along with income and goodwill, for which a remedy at law is inadequate.

**ANSWER**: The allegations in Count II are not directed to GAS. To the extent GAS is required to answer the allegations in Paragraph 59, on information and belief, GAS denies Meitzler breached the EEA before LCP materially breached the EEA. GAS denies the remaining allegations in Paragraph 59.

60.     This Court must enjoin and restrain Defendant Meitzler from further ongoing breach of his EEA duties and obligations. In addition to a remedy at equity, LCP seeks actual, incidental, compensatory, punitive, and consequential damages.

**ANSWER**: The allegations in Count II are not directed to GAS. To the extent GAS is required to answer the allegations in Paragraph 60, on information and belief, GAS denies Meitzler breached

the EEA before LCP materially breached the EEA. GAS denies LCP is entitled to any of the relief sought in Paragraph 60.

WHEREFORE, Defendant The Graphic Arts Studio, Inc. respectfully requests that this Court denies the relief Plaintiff Lake County Press, Inc. seeks in Count II of its Verified Complaint, enters Judgment in The Graphic Arts Studio, Inc.'s favor, and awards all other relief to The Graphic Arts Studio, Inc. that it deems just, equitable and proper.

## COUNT III – BREACH OF FIDUCIARY DUTY AND LOYALTY AGAINST MEITZLER

61. LCP incorporates its allegations in Paragraphs 1-60 above.

**ANSWER**: The allegations in Count III are not directed to GAS. To the extent GAS is required to answer them, GAS incorporates its Answers in Paragraphs 1-60 above.

62. Defendant Meitzler owed and still owes a fiduciary duty and duty of loyalty to LCP. Those duties include the obligation not to improperly retain and transfer LCP's assets, including customer lists, customer records, and all information relating to customers, and not to misappropriate or to use such property and information for his own benefit and enrichment.

**ANSWER**: The allegations in Count III are not directed to GAS. To the extent GAS is required to answer the allegations in Paragraph 62, GAS admits the existence of any duties imposed by law and denies Meitzler breached any such duties.

63. During his employment with LCP, Defendant Meitzler solicited, accepted and started employment with Defendant GAS, a direct competitor of LCP, in violation of his fiduciary duty and duty of loyalty to LCP.

**ANSWER**: The allegations in Count III are not directed to GAS. To the extent GAS is required to answer the allegations in Paragraph 63, GAS admits Meitzler solicited employment from GAS during his employment with LCP. GAS admits it provides services and products similar to those

offered by LCP. GAS denies Meitzler accepted and started employment with GAS during Meitzler's employment with LCP. GAS denies the remaining allegations in Paragraph 63.

64. Upon information and belief, Defendant Meitzler's breaches were intentional, willful, and without just cause.

**ANSWER**: The allegations in Count III are not directed to GAS. To the extent GAS is required to answer the allegations in Paragraph 64, GAS denies them.

65. As a result of Defendant Meitzler's breach of the duty of loyalty to LCP, Meitzler has irreparably injured and continues to irreparably injure LCP. Meitzler's actions threaten LCP with loss of value of its confidential, proprietary, and trade secret information and its relationships with various customers, along with income and goodwill, for which a remedy at law is inadequate.

**ANSWER**: The allegations in Count III are not directed to GAS. To the extent GAS is required to answer the allegations in Paragraph 65, GAS denies them.

66. This Court must enjoin and restrain Defendant Meitzler must be from current or ongoing violations of his duties under the EEA. In addition to a remedy at equity, LCP seeks actual, incidental, compensatory, punitive, and consequential damages.

**ANSWER**: The allegations in Count III are not directed to GAS. To the extent GAS is required to answer the allegations in Paragraph 66, GAS denies LCP has the right to enforce any of the obligations imposed on Meitzler under the EEA because, on information and belief, LCP materially breached the EEA before Meitzler committed any alleged breach of the EEA.

WHEREFORE, Defendant The Graphic Arts Studio, Inc. respectfully requests that this Court denies the relief Plaintiff Lake County Press, Inc. seeks in Count III of its Verified Complaint, enters Judgment in The Graphic Arts Studio, Inc.'s favor, and awards all other relief to The Graphic Arts Studio, Inc. that it deems just, equitable and proper.

25

## COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AGAINST GAS

67.     LCP incorporates its allegations in Paragraphs 1-66 above.

**ANSWER**: GAS incorporates its Answers in Paragraphs 1-66 above.

68.     The EEA is a valid and enforceable contract.  The EEA's confidentiality covenants and other provisions contained are reasonable in scope and duration and are reasonably necessary to protect LCP's legitimate protectable interests in its long-standing, well established and valuable customer relationships, its confidential information, and its goodwill.

**ANSWER**: On information and belief, GAS admits the EEA is valid and enforceable with respect to Meitzler's rights. GAS denies LCP has the right to enforce any of the obligations imposed upon Meitzler under the EEA because, on information and belief, LCP materially breached the EEA before Meitzler committed any alleged breach of the EEA. Further answering, on information and belief, all of the customers Meitzler serviced while Meitzler was employed by LCP were relationships Meitzler developed before Meitzler began working for LCP.

69.     Upon information and belief, Defendant GAS was aware of the EEA well before offering a position of employment to Defendant Meitzler.

**ANSWER**: GAS admits it was aware of the EEA before offering an employment position to Meitzler.

70.     Upon information and belief, despite having knowledge of the EEA, Defendant GAS intentionally induced, permitted, and incentivized Defendant Meitzler to violate his current contractual obligations owed to LCP, without justification, in an effort to obtain LCP's confidential information and to unfairly compete with LCP.

**ANSWER**: GAS denies LCP has the right to enforce any of the obligations imposed upon Meitzler under the EEA because, on information and belief, LCP materially breached the EEA before

Meitzler committed any alleged breach of the EEA. GAS denies that it provided employment to Meitzler to obtain LCP's confidential information and/or unfairly compete with LCP. GAS denies the remaining allegations in Paragraph 70.

71.     Upon information and belief, the intentional interference by Defendant GAS was malicious, unjustified and accomplished through wrongful means, including but not limited to, inducing, aiding or abetting Defendant Meitzler to breach his EEA with LCP, and an attempt to intentionally weaken LCP, in an effort to acquire business that would otherwise have been awarded to LCP.

**ANSWER**: GAS denies the allegations in Paragraph 70. Further answering, GAS denies LCP has the right to enforce any of the obligations imposed upon Meitzler under the EEA because, on information and belief, LCP materially breached the EEA before Meitzler committed any alleged breach of the EEA.

72.     Defendant GAS' intentional interference has caused LCP to suffer irreparable and other significant injuries.  In addition to a remedy at equity, LCP seeks actual, incidental, compensatory, punitive, exemplary and consequential damages, and attorney's fees and costs.

**ANSWER**: GAS denies LCP has suffered any injuries. GAS denies LCP is entitled to any of the relief sought in Paragraph 72.

WHEREFORE, Defendant The Graphic Arts Studio, Inc. respectfully requests that this Court denies the relief Plaintiff Lake County Press, Inc. seeks in Count IV of its Verified Complaint, enters Judgment in The Graphic Arts Studio, Inc.'s favor, and awards all other relief to The Graphic Arts Studio, Inc. that it deems just, equitable and proper.

27

## AFFIRMATIVE DEFENSES

### AFFIRMATIVE DEFENSE 1: PRIOR MATERIAL BREACH – FAILURE TO PAY COMMISSIONS DUE UNDER SECTION 4(b) OF EXECUTIVE EMPLOYMENT AGREEMENT

Pursuant to Section 4(b) of the Executive Employment Agreement (the "EEA"), LCP was required to timely pay Meitzler commissions on his sales. On information and belief, prior to September 1, 2023, LCP failed to pay Meitzler for sales commissions Meitzler earned. On information and belief, the most recent commission statement LCP provided to Meitzler, which relates to commissions due through May 31, 2023, states LCP owes Meitzler $163,382.13 in unpaid commissions. (Exhibit 1).

LCP's failure to timely pay commissions to Meitzler in accordance with Section 4(b) of the EEA predated any alleged breach of the EEA by Meitzler. LCP's breach of Section 4(b) of the EEA relieved Meitzler of the obligations imposed upon Meitzler under the EEA.

### AFFIRMATIVE DEFENSE 2: PRIOR MATERIAL BREACH – FAILURE TO PAY OVERRIDE COMMISSIONS DUE UNDER SECTION 4(c) OF EEA

Pursuant to Section 4(c) of the EEA, between April 2, 2022 and April 2, 2023, LCP was required to pay Meitzler override commissions in the amount of 1.8% on sales to customers of The P.H.I Group, Inc. d/b/a eDoc Communications ("eDoc") and sales to new customers generated by former eDoc sales representatives that were booked between April 2, 2022 and April 2, 2023 (not including eDoc customers that were also LCP's customers). On information and belief, prior to September 1, 2023, LCP failed to pay Meitzler for any override commissions in accordance with Section 4(c) of the EEA.

LCP's failure to timely pay override commissions to Meitzler in accordance with Section 4(c) of the EEA predated any alleged breach of the EEA by Meitzler. LCP's breach of Section 4(c) of the EEA relieved Meitzler of his obligations under the EEA.

28

### AFFIRMATIVE DEFENSE 3: PRIOR MATERIAL BREACH – FAILURE TO PAY ALLOWANCES OR REIMBURSEMENT DUE UNDER SECTION 3(b) OF EEA

Pursuant to Section 3(b) of the EEA, during the time in which LCP employed Meitzler, LCP was required to pay Meitzler allowances or reimbursements for cellular telephone, laptop computer, and automobile usage in accordance with LCP's policies and practices afforded to other similarly situated LCP employees. On information and belief, LCP never provided any such allowances or reimbursements to Meitzler in accordance with Section 3(b) of the EEA.

LCP's failure to provide allowances or reimbursements in accordance with Section 3(b) of the EEA predated any alleged breach of the EEA by Meitzler. LCP's breach of Section 3(b) of the EEA relieved Meitzler of his obligations under the EEA.

### AFFIRMATIVE DEFENSE 4: PRIOR MATERIAL BREACH – VIOLATION OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

In Illinois, the implied duty of good faith and fair dealing applies to every contract unless expressly disavowed. The benefit of Meitzler's bargain in entering into the EEA was that LPC would process customers' orders in a timely manner in accordance with industry standards so that he would be paid commissions. On information and belief, LCP breached its implied duty of good faith and fair dealing by failing to service customers Meitzler sold products and services to in a timely manner, which caused Meitzler to lose important customer relationships and, consequently, commissions.

LCP's failure to process customers' orders in a timely manner in accordance with industry standards predated any alleged breach of the EEA by Meitzler. LCP's breach of its implied duty of good faith and fair dealing relieved Meitzler of his obligations under the EEA.

29

## AFFIRMATIVE DEFENSE 5: EEA RESTRICTIVE COVENANT PROVISIONS ARE AN UNREASONABLE RESTRAINT ON TRADE

The EEA provides that Meitzler is prohibited from soliciting customers "to whom [LCP] sold such products or services" (EEA, Section 5(b)). This provision is overly broad in that, if Meitzler had a relationship with certain customers that pre-dated his employment relationship with LCP (which, on information and belief, he did), the language is an improper restraint on trade.

## AFFIRMATIVE DEFENSE 6: LPC LACKS A LEGITIMATE PROTECTABLE INTEREST

LCP does not have a legitimate business interest in restricting Meitzler from selling to customers that Meitzler had a relationship with which pre-dated Meitzler's relationship with LCP.

## AFFIRMATIVE DEFENSE 7: FRAUD IN THE INDUCEMENT

On information and belief, before Meitzler signed the EEA, he advised LCP's President and Chief Executive Officer, Thomas R. Johnson ("Johnson"), that he was not willing to sign an employment agreement that included restrictive covenants. Johnson told Meitzler that signing the EEA was a condition precedent to the closing of the APA transaction (from which no proceeds were paid to Meitzler) and the LCP never had enforced restrictive covenants and never would enforce restrictive covenants. Based on Johnson's statement, Meitzler signed the EEA.

Johnson made a false statement of material fact that Johnson knew or believed to be false and which was made with the intent to induce Meitzler to sign the EEA under false pretenses. Meitzler reasonably relied on Johnson's statement and signed the EEA. Meitzler has been damaged as a result of his reliance on the false statement by being forced to defend himself against LCP's attempt to enforce the restrictive covenants set forth in Section 5 of the EEA.

30

**AFFIRMATIVE DEFENSE 8: LACK OF SUBJECT MATTER JURISDICITON**

LCP has not sufficiently pled a cause of action for under the DTSA because it has failed to properly identify any alleged proprietary information and/or trade secrets in Count I. To the extent any proprietary information and/or trade secrets are subject to LCP's allegations in Count I, LCP has failed identify how the steps it has taken to protect that information.

Because LCP has not pled a cause of action under the DTSA, the Court does not have federal question jurisdiction and cannot exercise supplemental jurisdiction over LCP's remaining claims.

Dated: October 6, 2023                                                            Respectfully submitted,


By: */s/ Samuel J.H. Weyers*


Ronald B. Kowalczyk (IL Bar No. 6274373)
Samuel J.H. Weyers (IL Bar No. 6307309)
Buckley Fine, LLC
201 S. Grove Ave., 4th Floor
Barrington, Illinois 60010
(847) 381-0011
rkowalczyk@buckleyfinelaw.com
sweyers@buckleyfinelaw.com

31

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that on October 6, 2023, he filed the foregoing *Defendant The Graphic Arts Studio, Inc.'s Answer to Verified Complaint for Injunctive and Other Relief and Affirmative Defenses* via the Court's CM/ECF electronic filing system, which will send notice of such filing to all registered users, as set forth below:

**Janet A. Pioli**
**Judy He**
jpioli@crowell.com
jhe@crowell.com
Crowell & Moring, LLP
455 North Cityfront Plaza Drive
Suite 3600
Chicago, Illinois 60611
**Attorney for Plaintiff**

**Evan B. Karnes II**
**Everardo Martinez**
evan@karneslaw.com
everardo@karneslaw.com
Karnes Law Chartered
177 North State Street
Chicago, IL 60602
**Attorney for Plaintiff**

**Anne Li (pro hac vice forthcoming)**
ali@crowell.com
Crowell & Moring, LLP
590 Madison Ave., #20th
New York, NY 10022
**Attorney for Plaintiff**

By: ___*/s/ Samuel J.H. Weyers*_____

32

# COMMISSION STATEMENT
## May 2023

**Tom Meitzler**

| | 5/31/2023 YTD | 5/31/2023 | 4/30/2023 | 3/31/2023 | 2/28/2023 | 1/31/2023 |
|---|---|---|---|---|---|---|
| Sales: | 1,427,456.50 | 181,375.59 | 270,633.01 | 448,362.02 | 270,031.09 | 257,054.79 |
| Commissions Due before Adjs | 140,630.85 | 17,462.93 | 39,132.09 | 40,216.68 | 23,521.02 | 20,298.13 |
| | 9.9% | 9.6% | 14.5% | 9.0% | 8.7% | 7.9% |
| Adjustments: | | | | | | |
| Past Due Accounts | 25,009.16 | 12,457.21 | 2,620.59 | 1,593.05 | 8,338.31 | - |
| Commission Adjustment (+/-) | - | - | - | - | - | - |
| Account Manager Commission | - | - | - | - | - | - |
| Prior period balance brough forward | 179,010.44 | 183,376.41 | 171,864.92 | 164,491.28 | 174,308.58 | 179,010.44 |
| Commission Due Balance: | 294,632.13 | 188,382.13 | 208,376.41 | 203,114.92 | 189,491.28 | 199,308.58 |
| Payroll Payments: | | | | | | |
| Weekly Draws | 131,250.00 | 25,000.00 | 25,000.00 | 31,250.00 | 25,000.00 | 25 000.00 |
| Commission Payments | - | - | - | - | - | - |
| Additional Payments | - | | | | | - |
| Total Payroll Payments | 131,250.00 | 25,000.00 | 25,000.00 | 31,250.00 | 25,000.00 | 25,000.00 |
| Commission in Escrow/(Deficit) | 163,382.13 | 163,382.13 | 183,376.41 | 171,864.92 | 164,491.28 | 174,308.58 |