UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Lake County Press, Inc., *Plaintiff*, v. Thomas Meitzler, *et al.*, *Defendants*. | No. 23 CV 10066 Judge Lindsay C. Jenkins |

MEMORANDUM OPINION AND ORDER

Lake County Press (LCP), an Illinois printing company, sued its former employee, Thomas Meitzler, and Meitzler's current employer, Graphic Arts Studio (GAS), another Illinois printing company. The verified complaint contains four claims: (1) violation of the Defend against Trade Secrets Act against Meitzler and GAS; (2) breach of contract against Meitzler; (3) breach of fiduciary duty and loyalty against Meitzler; and (4) tortious interference with contractual relations against GAS. [Dkt. 25.] Meitzler counterclaimed that LCP violated the Illinois Wage Payment and Collection Act. [Dkts. 46, 47.][1]

In November 2023, the court entered a preliminary injunction agreed upon by the parties. [Dkt. 61.] The injunction prohibited Defendants from disclosing LCP's confidential information or trade secrets, violating any contractual duties, and soliciting or accepting business from several customers until September 19, 2024. The injunction did not prohibit Meitzler from continuing his employment with GAS.

The parties have now filed cross-motions for summary judgment. [Dkts. 110, 112.] LCP moves for summary judgment on claims one (Defend Against Trade Secrets), two (breach of contract), and three (breach of fiduciary duties). Meitzler and GAS filed a motion together seeking summary judgment on the counterclaim and claims two (breach of contract), three (breach of fiduciary duty), and four (tortious interference of contract). The motions are denied.

Meitzler and GAS also move for sanctions against LCP, which the court grants. [Dkt. 108.]

---

[1] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

1

I.   Background

The court draws on the parties' Local Rule 56.1 statements to summarize the facts. Unless noted, the facts below are undisputed. The court only relays facts that are material—that is, "facts that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

   A.   Meitzler's Move from LCP to GAS

Plaintiff Lake County Press is a printing company based in Waukegan, Illinois. [Dkt. 134, ¶ 1.] Defendant Graphic Arts Studio is a printing company based in Barrington, Illinois that competes with LCP. [*Id.*, ¶ 3.]

In April 2020, LCP purchased certain assets, including customer lists and contacts, from another printing company, eDoc. [*Id.*, ¶¶ 5–9.] Defendant Thomas Meitzler, a shareholder of eDoc at the time, signed the asset purchase agreement between eDoc and LCP. [*Id.*, ¶ 9.] On the same day the companies executed the asset purchase agreement, Meitzler entered into an Executive Employment Agreement, making him LCP's Senior Vice President of Sales. [*Id.*, ¶¶ 12, 14.] In that role, he sold LCP's printing services to clients included in the customer list from the asset purchase agreement, such as ADM, Coudal, and IKEA. [*Id.*, ¶¶ 8, 11–13.] He worked from home about 50% of the time and, with LCP's permission, used his personal cellphone and computer for work, including a personal desktop for which LCP set up a VPN. [Dkt. 162-4, ¶¶ 1–8.]

A year into his employment with LCP, Meitzler began speaking with GAS about potential employment opportunities with them. [Dkt. 134 at ¶ 15.] He provided GAS a copy of his LCP employment agreement so they could seek the opinion of counsel regarding his prospects of joining the company. [*Id.*] In October 2022, based on Meitzler's representation that he could sell $3.5 million in printing services to "his clients" that would come with him, GAS sent Meitzler an offer of employment. [*Id.*, ¶¶ 17–18.] Meitzler did not accept the offer right away. He continued to work for LCP and, in June 2023, he requested an updated employment offer from GAS. [*Id.*, ¶ 21.]

On July 18, 2023, Meitzler accessed LCP's server and downloaded a local backup of his Outlook mailbox, including client files, customer data, and pricing information, to his personal laptop. [*Id.*, ¶ 22.]

On August 3, 2023, GAS set up Meitzler with a company email address and in mid-August Meitzler accepted GAS's offer of employment. [*Id.*, ¶ 23.] Even before August 3, however, Meitzler had "solicited LCP client ADM on GAS's behalf to set up GAS as an ADM approved vendor." [*Id.*, ¶ 24.] A few weeks later, he emailed GAS's Vice President of Sales requesting banking information so that he could finish setting up GAS as a procurement vendor for ADM. [*Id.*, ¶ 25.] And on August 4, Meitzler emailed IKEA to inform them that he was joining GAS. [*Id.* ¶ 26.] In the email, he represented that he could offer IKEA a discount of 10–20% savings on the cost of all

2

inventory and store items if they moved their business to GAS. [*Id.*, ¶ 27.] He also told IKEA that his customer service representative, Vinny Atella (an LCP employee at the time), would be moving to GAS with him. [*Id.*, ¶ 29.] All the while, Meitzler continued to work for LCP. [*Id.*, ¶¶ 25, 31.]

Meitzler created a second backup of information from his LCP Outlook email on August 20, 2023, this time including more data. [*Id.*, ¶ 35.] In addition to these backups, Meitzler had numerous LCP-related file folders, including information about client and pricing, on his personal home computer, which, with LCP's authorization, he used for work. [*Id.*, ¶ 36.] On August 28, Meitzler met with LCP's Executive Management Team. [*Id.*, ¶ 41.] At the meeting, Meitzler requested that LCP permit him to broker business to LCP competitors as well as to LCP—a request he had made (and been told no) once before—and told them he needed an answer by September 1. [*Id.*, ¶¶ 39–42.]

The next day Meitzler sent an email quote to Coudal for work to be performed by GAS, signing off: "Thank you for considering Graphic Arts Studio." [*Id.*, ¶¶ 44–45.] GAS officially opened this job on September 5. [*Id.*, ¶ 56.]

Meitzler sent an email resigning from LCP on September 1. [*Id.*, ¶ 47.] That same day, GAS placed him on their payroll. [*Id.*, ¶ 49.] And three hours after he resigned from LCP, Meitzler informed ADM of his move. [*Id.*] Meitzler later contacted via email or phone Yamaha Motor, Coudal, Motorola, IKEA, and Supply Logic—all LCP customers at the time—to confirm his prior communications concerning his move to GAS. [*Id.*, ¶ 52–53.] Coudal and IKEA were not GAS clients before Meitzler joined the company. [*Id.*, ¶ 57.]

Meanwhile, LCP learned that Meitzler had changed the password for an online portal that he used to login to IKEA's portal, blocking LCP's access to the portal. [*Id.*, ¶¶ 50–51.] According to Meitzler, he believed the portal was personal to him. [*Id.*, ¶ 50.]

### B. The Asset Purchase Agreement

The asset purchase agreement entered into on April 2, 2020 is an agreement between the company, eDoc, "together with Michael Frank, Thomas Meitzler and Brian Bending" (eDoc's shareholders) as the sellers and Lake County Press as the purchaser. [Dkt. 29-7 at 2.] Pursuant to the agreement, Lake County Press purchased various assets from eDoc, including, among other things, unfilled sales orders and work in progress, "customer lists, customer records and information related to the customers" of the sellers. As relevant here, the agreement contains a merger clause stating that it is "the entire agreement between the parties and supersedes any and all prior or contemporaneous agreements of any kind, whether written or oral."

3

### C. The Executive Employment Agreement

On April 2, 2020 Thomas Meitzler signed an Executive Employment Agreement with Lake County Press. [Dkt. 29-5.]

For his role as Vice President of Sales, Lake County Press agreed to pay Meitzler a $200,000 draw against commissions in weekly equal installments. According to the agreement, Meitzler's commission and salary were subject to the regular company policies (which LCP reserved the right to modify) and LCP was entitled to audit and "true up" the draw against commissions on a semi-annual basis. "Any draw in excess of Commissions earned to the date of 'true up,' the agreement states, "shall result in reduction of draw and commission payments until recovered by the Company." The agreement provided that, should Meitzler resign before the three-year employment term expired, his resignation would be effective 15 business days after he provides written notice to LCP.

The agreement also contains several restrictive covenants. First, it states that "the relationships between the Company and its customers are of a near permanent nature and that the information which [Meitzler] will have access to is of a confidential and proprietary nature and the good will of the Company and its customer relationships which [Meitzler] will enjoy while employed by the Company are significant and valuable to the Company." Second, the agreement contained a non-solicitation clause barring Meitzler from selling products or services that are competitive with the products and services offered by LCP to customers that LCP sold products to during the term of his employment for one-year post-termination. Third, the agreement prohibited Meitzler from attempting to solicit any LCP employee for outside employment for a "period equal to the Employment Term of the Agreement, [which is three years,] plus one year."

The employment agreement has a confidentiality clause requiring Meitzler, "for the longest period of time permitted under applicable law," to avoid disclosing confidential information outside his duties for LCP. It also requires him to return all tangible items which may relate to or contain confidential information upon termination.

"Confidential information" is defined as "all information, including trade secrets, disclosed to [Meitzler] or known by [him] as a consequence of or through his employment by the Company, concerning the products or services offered by the Company" that "has not been generally available to the public, and is useful or of value to the Company's or Affiliates' current or anticipated business, research or development activities or of those of any customer or supplier or the Company or its Affiliates" or "has been identified to [Meitzler] as confidential, either orally or in writing." The agreement provides several examples of confidential information, including "current and prospective customer lists and information on customers or

4

their employees" and "the Company's cost, pricing and purchasing information or policies."

Like the asset purchase agreement, the employment agreement contains a merger clause, stating that it is "the complete agreement and understanding among the parties and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way."

### D. Meitzler's Commissions

The LCP commission policy in effect during Meitzler's employment stated that LCP would pay out commissions on a sales representative's invoices once the customer paid those invoices in full. [Dkt. 120-6 at 73.] If a customer pays late, moreover, the sales representative's commission is reduced on a sliding scale—10% reduction when payment is received for an invoice aged over 90 days, 20% for invoices aged 120 days, and 30% reduction for invoices aged 150 days. While a sales representative is not required to facilitate in collecting payments for their invoices, the policy states that they "are welcomed to inquire or assist with the collection effort."

The policy then describes certain documents LCP provides to sales representatives concerning commissions. Each month, among other reports, LCP issues a "Monthly Commission Statement," which shows the sales representative's "current total monthly sales, commission earned on current monthly sales, current month adjustments, paid weekly draws in the month along with commission check totals, and the amount of commission balance due." And semi-monthly the company issues a "Commission Payment Summary Statement, which lists "all invoices that payment was received along with commissions earned and due on those invoices." "Commissions due," the policy explains, "will be totaled and offset by weekly draws and adjustments, with a net amount due and to be paid in the next semi-monthly payment period." Each sales representative also received a semi-monthly "Current Period Commission Due Report," showing "the current amount of commission earned eligible to be paid by invoice."

Between April 1, 2020 and August 25, 2023, LCP adjusted Meitzler's commissions for customers' late payments by reducing his earned commissions by about $101,865. [Dkt. 162-3, ¶ 18.] LCP made further adjustments after Meitzler resigned, reducing his earned commission by more than $70,000 for customers' late payments. [*Id.*, ¶ 22.] According to Meitzler, LCP failed to credit him for several commissions he earned and reduced his commissions by another $70,000 for a "WIP Adjustment." [*Id.*, ¶¶ 19–21.] Jennifer Glassford, an LCP employee who reviewed Meitzler's commission statements, however, testified that Meitzler was never paid out for commissions because he never generated commissions in excess of his draw. [*Id.*, ¶ 24.] And Meitzler never points to evidence that shows otherwise.

5

## II. Analysis

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). When reviewing cross-motions for summary judgment, the court views the facts and "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Med. Protective Co. of Fort Wayne, Indiana v. Am. Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018). Defeating summary judgment requires evidence, not mere speculation. See *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021).

### A.    Defend Against Trade Secrets Act

"To prevail on a DTSA misappropriation claim, a plaintiff must show that (1) their information was a trade secret; (2) it was misappropriated; and (3) it was used in the defendant's business." *NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, 163 F.4th 1091, 1096 (7th Cir. 2026). Allegedly misappropriated information constitutes a trade secret if the owner implemented "reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839.

LCP asserts that its "customer list, client contacts and historical pricing and profit margins," as well as "bespoke solutions, pricing strategies, and prospective business plans," constitute trade secrets. [Dkt. 162 at 9.] Some of these categories, customer lists and pricing information for example, have qualified as trade secrets under certain circumstances. See, *e.g.*, *Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, 2023 WL 5334638, at *14 (N.D. Ill. Aug. 18, 2023) ("Customer lists, meaning a business's collection of customer identities, are protectable trade secrets."); *APC Filtration, Inc. v. Becker*, 646 F. Supp. 2d 1000, 1010 (N.D. Ill. 2009) (customer list constituted trade secret when company spent twelve years developing the list and tailored pricing information).

But as the Seventh Circuit has emphasized on several occasions, the reasonableness of confidentiality measures is most often a question for the jury. See *Tax Track Sys. Corp. v. New Investor World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007) ("Typically, what [protective] measures are reasonable in a given [trade secret] case is an issue for a jury."); *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003) ("[O]nly in an extreme case can what is a 'reasonable'

6

precaution be determined [as a matter of law], because the answer depends on a balancing of costs and benefits that will vary from case to case."). And courts have considered an employer's decision to allow employees to use personal devices to access confidential documents and failure to inspect those devices at the time of an employee's termination as factors counseling against a finding of reasonable measures. See *DM Trans, LLC v. Scott*, 38 F.4th 608, 622 (7th Cir. 2022).

Here, a jury could certainly find that LCP imposed reasonable confidentiality measures to protect its alleged trade secrets. Meitzler had to sign a confidentiality agreement as a condition of employment. And LCP stores client information on a protective server in password-protected files and restricts access to the salesperson assigned to the specific client.

On the flipside, though, a jury could find it unreasonable that LCP allowed its employees to use personal devices for work and download company files onto those devices without inspecting them when an employee leaves the company. Deciding how to assess and weigh these measures is ultimately a task for the jury. See *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 273 (N.D. Ill. 2020) (denying summary judgment on the reasonable measures question when company used password protection and confidentiality agreements but displayed products at trade shows and sales presentations); *IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, 304 F. Supp. 3d 746, 758 (N.D. Ill. 2018) (finding question of fact as to reasonable measures when company included confidentiality disclaimers on documents but shared confidential information in emails without any disclaimer).

Questions of fact also remain as to whether LCP's customer list and pricing information was readily ascertainable. Information that is public, easily discoverable, or general knowledge within the relevant industry is not a trade secret. See *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 541 (7th Cir. 2021). Whether the allegedly misappropriated information meets these requirements is a question of fact. *Id.*

LCP's statement of facts sheds very little light on this element. The court has no way of knowing, for instance, whether LCP clients were free to share LCP's quotes when shopping around for the best vendor. See *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished."). Nor can the court determine from the record whether LCP's clients or prices were publicly known throughout the industry. See *My Fav Elecs., Inc. v. Currie*, 2024 WL 4528330, at *13 (N.D. Ill. Oct. 18, 2024) (explaining that trade secret protection for customer lists depends on, among other things, the availability of customer information in a public directory and the size of a particular class of potential customers in the industry).

Even if the court were to conclude that LCP's quotes and pricing information constitute trade secrets, a jury could find that Meitzler and GAS did not use that

7

information. GAS presents evidence that it used its own methods to come up with quotes for LCP customers. [Dkt. 162-4, ¶ 26.]; see *Rotec Indus., Inc. v. Mitsubishi Corp.*, 179 F. Supp. 2d 885, 894 (C.D. Ill. 2002) (finding no misappropriation of a plaintiff's pricing strategies and quotations when defendant presented evidence that they did not use the information when creating their own bids). And, while Meitzler's emails suggest that he used his knowledge of LCP customer contact information, they say little about whether he used LCP's quotes or pricing strategies.

At bottom, LCP's motion for summary judgment on this claim leaves more questions than answers, making it ill-suited for judgment as a matter of law.

### B. The Illinois Wage Payment and Collection Act

Under the Illinois Wage Payment and Collection Act, "[e]very employer shall be required, at least semi-monthly, to pay every employee all wages earned during the semi-monthly pay period. Wages of executive, administrative and professional employees, as defined in the Federal Fair Labor Standards Act of 1939, may be paid once a month. Commissions may be paid once a month." 820 ILCS 115/3. Pointing to LCP's commission policy, Defendants assert that LCP violated the Act. The policy, Defendants reason, states that an employee "earns" a commission at the time an invoice is created. Comparing LCP's use of "earn" in the policy to the Act's use of "earn," Defendants insist that the policy violates the Act by not paying employees their "earned" commissions during the month the invoice is created.

But a close comparison of the Act with LCP's commission policy reveals no violation. "The purpose of the Wage Act is to provide Illinois employees with a cause of action for the timely and complete payment of earned wages or final compensation." *Watts v. ADDO Management, L.L.C.*, 97 N.E.3d 75, 79 (Ill. 2018). An employer cannot circumvent this purpose, the Seventh Circuit has explained, by imposing an "arbitrary date on which wages are earned, completely unrelated to the employee's duties." *Sutula-Johnson v. Off. Depot, Inc.*, 893 F.3d 967, 979 (7th Cir. 2018). "Otherwise, an employer could say that employees accrue wages at a rate of $10 for every hour worked, but they do not earn the wages until they are paid on the last day of the month," making the Act's semi-monthly payment requirement ring hollow. *Id.*

The Act does not, however, prevent an employer from setting "the requirements for earning a wage or commission" in ways that do not undermine timely and fair payments. *Id.* LCP's commission policy does just that. An employee is eligible for a commission payment once the invoice for the sale has been paid to LCP. [Dkt. 120-6 at 73.] The Defendants, relying on *Sutula-Johnson*, assert that this imposes an "arbitrary date" "completely unrelated to the employee's duties." [Dkt. 120 at 2–4.] Not so.

In *Sutula-Johnson*, an employer crafted a commission plan where an employee "accrued" commissions on the date a customer was invoiced but did not "earn" that

8

commission until the date the employer paid the employee the commissions, which occurred on a quarterly basis. *Sutula-Johnson*, 893 F.3d at 97. In other words, regardless of when the employee "accrued" the commissions by making a successful sale, the employee would be paid for accrued commissions only four times a year. *Id.* This commission payment scheme, the Seventh Circuit explained, violated the Illinois Wage Payment and Collection Act—which, recall, required an employer to pay an employee earned commissions on a monthly basis—by delaying an employee's earnings in a way completely unrelated to the employee's work and performance. *Id.* at 978.

Unlike the commission payment scheme in *Sutula-Johnson*, LCP's commission policy allows an employee to be paid for commissions on a monthly basis. [Dkt. 120-6 at 73 (stating that LCP pays commissions "twice per month based [on] payment of the invoice").] And while an LCP salesperson has no obligation to assist in collecting a customer's payment for an invoice, it would be difficult to conclude that requiring an invoice to be paid off before paying an employee's commission for that invoice is an arbitrary requirement or unrelated to a salesperson's job duties. Quite the opposite: it makes sound sense to pay an employee's commission out of money earned from the employee's sale, and until a customer pays their invoice, there is no money from the sale. The Seventh Circuit in *Sutula-Johnson* seemed to appreciate this sentiment, specifically taking note that, unlike the commission policy in this case, the employer in that case paid an employee's commission regardless of whether the customer actually ended up paying the invoice. 893 F.3d at 979, n.2.

Nevertheless, the Defendants urge the court to read "earned" in LCP's commission policy in the same way the Illinois Wage Payment and Collection Act uses the word. That is, to require LCP to pay its employees their commissions at the time the customer is invoiced. But applying a commonsense interpretation, the commission policy does not use "earn" in the same way the Act does. Under the policy, a salesperson "earns" a commission at the time they create an invoice. "Earning" the commission under the policy, however, does not guarantee that the employee collects that commission as part of their final wages. Instead, the commission policy requires a second step, payment of the invoice, and a third step, adjustments for other factors, such as past due accounts and the difference in the already paid "draw."[2] Until all

---

[2] The Defendants argue that LCP violates the Act by making adjustments to an employee's commission payments based on when a customer pays an invoice. Defendant is correct that the Act provides that "deductions by employers from wages or final compensation are prohibited unless…made with the express consent of the employee, freely given at the time the deduction is made." 820 ILCS 115/9. But LCP's policy does not make prohibited deductions. As the written policy incorporated by reference into Meitzler's employment agreement explains, an employee is eligible for commission payments once a customer pays LCP, and the commission payment is calculated based on, among other factors, the date the customer pays.

those steps are met pursuant to the policy, the employee is not eligible to be paid for any commissions.

Remember the goal of the Act is to ensure timely payment of earned wages and final compensation. In pursuit of that goal, it requires employers "to pay every employee wages earned" either monthly or semi-monthly. 820 ILCS 115/3. "Wages" are "any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation," including commission. 820 ILCS 115/2. With this background in mind, LCP's commission policy is not using "earned" in the same way as the Act because, under the policy, an employee is not "owed" payment on "earned" commissions until a customer pays the invoice and LCP makes the relevant adjustments. Put differently, until all steps under the commission policy are satisfied, an employee has no right to payment for the associated commission, so LCP owes them nothing. The employee is paid the commission in a timely manner once all requirements under the commission policy are met, and that is all the Illinois Wage Payment and Collection Act requires.[3]

### C.  Breach of Contract, Tortious Interference with Contract, and Breach of Fiduciary Duty of Loyalty

Defendants move for summary judgment on the breach of contract and tortious interference of contract claims based on their assertions that LCP violated the Illinois Wage Payment and Collection Act. For the reasons above, that argument fails so the Defendants' motion for summary judgment on these claims is denied.

LCP, for its part, moves for summary judgment on its breach of contract, tortious interference of contract, and breach of fiduciary duty claims. Each of these claims requires LCP to establish that the alleged breach caused its alleged damages or injury. See *Ivey v. Transunion Rental Screening Sols., Inc.*, 215 N.E.3d 871 (Ill. App. Ct. 2021) ("In a breach of contract case, a plaintiff must establish an actual loss or measurable damages resulting from the breach in order to recover." (cleaned up)); *Power Dry of Chicago, Inc. v. Bean*, 200 N.E.3d 74, 96 (Ill. App. Ct. 2022) ("The elements of [tortious interference with contract] are (1) the existence of a valid and enforceable contract between the plaintiff and another, (2) the defendant's awareness of this contractual relation, (3) the defendant's intentional and unjustified

---

[3] In their reply brief, Defendants argue for the first time that, even if LCP's commission policy complied with the Illinois Wage Payment and Collection Act, LCP violated the Act because Meitzler earned commissions in excess of his draw and LCP impermissibly treated timely paid invoices as late and failed to account for other timely paid invoices. [Dkt. 163-2 at 6–10.] But arguments raised for the first time in a reply brief are waived. See *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021). The arguments also depend on facts not presented in the Defendants' statement of material facts. See *Carter v. Finley Hosp.*, 2003 WL 22287392, at *1 (N.D. Ill. Sept. 30, 2003) ("The moving party has the responsibility of asserting all facts relied upon in its opening statement of facts under Local Rule 56.1(a).").

inducement of a breach of the contract, (4) a subsequent breach by the other, caused by the defendant's wrongful conduct, and (5) damages."); *Alpha Sch. Bus Co. v. Wagner*, 910 N.E.2d 1134, 1158 (Ill. App. Ct. 2009) ("To state a cause of action for breach of fiduciary duty, a plaintiff must allege and ultimately prove (1) a fiduciary duty on the part of the defendant, (2) a breach of that duty, (3) an injury, and (4) a proximate cause between the breach and the injury.").

First, LCP did not respond to Defendants' argument that it failed to establish damages. See *Perry v. Coles Cty., Illinois*, 906 F.3d 583, 590 n.5 (7th Cir. 2018) ("Plaintiffs did not respond to this argument in their reply brief, so waiver applies."). Waiver aside, LCP's statement of facts does not allow for a finding that it has established damages as a matter of law.

LCP broadly asserts in its statement of facts that "[a]s a result of Meitzler's actions, LCP suffered and is continuing to suffer substantial losses and damages." [Dkt. 134, ¶ 71.] In support of these statements, LCP cites the declaration of Peter Douglas, LCP's Senior Vice President, Director of Sales and Marketing, which states:

> 30. Meitzler's improper actions directly harmed LCP. Because LCP lost access to one of its key Customer Portals, LCP was required to use extensive time and human resources to contact its customer, explain the situation, and reassure them of their business and quality of their services. In addition, LCP has lost revenue preliminarily estimated to exceed $1,099,000.00 annually.
>
> 31. LCP continues to contact LCP customers to inform them of the circumstances of Meitzler's resignation and to investigate the scope of LCP's losses. However, as mentioned earlier, I'm aware that Meitzler is already in the process of using LCP's confidential and proprietary information to contact LCP's customers and offer them more competitive pricing, so they will follow him to GAS.

[Dkt. 165, ¶¶ 30–31.] But "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted," *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998), and Douglas's statement is nothing more than a bald assertion. He provides no basis for the million-dollar figure. Nor does he explain his personal knowledge of the company's financial situation or whether clients ultimately followed Meitzler to GAS.

Douglas's deposition testimony sheds more light on the one-million-dollar figure, but it does not help LCP. He explained that the $1,099,000 in annual revenue referenced in his declaration was a consequence of Meitzler changing the customer portal password for one of LCP's clients. [Dkt. 122-7 at 56–57.] Because of the password change, he said, LCP had to expend time and money investigating and

11

reaching out to the client to explain the situation. According to Douglas, the client expressed concern about what transpired, which caused uncertainty about LCP's ability to retain that business.

Douglas's testimony and declaration about damages stemming from the password change, however, says nothing about damages stemming from the alleged breach of contract or fiduciary duties. The relevant contract concerns solicitation and confidentiality, and LCP does not argue that Meitzler violated his fiduciary duties by changing the password to a client portal. [Dkt. 162 at 12–13.]

And while LCP provides evidence that Meitzler solicited several of its clients, it never connects that solicitation with its own loss of business or profits. The court is left in the dark on whether those clients would have purchased additional products from LCP if the defendants had not solicited them. It's possible, for example, that GAS offered products that LCP did not or that the clients would have followed Meitzler to GAS regardless of any solicitation. Indeed, in most instances, LCP does not even identify whether the clients actually purchased products from GAS.

Because a juror could find that LCP suffered no damages from Defendants' alleged breaches of contract or fiduciary duties, the court denies summary judgment for LCP on these claims.

### III. Motion for Sanctions

Meitzler and GAS seek attorney's fees from LCP arising from their reliance on a spreadsheet LCP produced in January 2025 during fact discovery purporting to detail Meitzler's post-termination commission calculations under LCP's commission policy. [Dkt. 108 at 2.] All now agree that the spreadsheet—something the parties refer to as Exhibit 2—incorrectly calculated the commissions owed to Meitzler. Relying on the materials provided, Defendants say they issued supplemental written discovery requests to LCP and scheduled the Rule 30(b)(6) deposition of LCP's Director of Accounting and Finance Jennifer Glassford, to probe the details of the commissions owed. [*Id.* at 3-4.]

In August 2025, Glassford was deposed. Right away, she explained that Exhibit 2 did not accurately reflect commissions owed to Meitzler because that document applied an old version of LCP's commission policy. Upon realizing the mistake in February 2025, Glassford updated the calculations using the 2019 commission policy and provided a revised set of commissions calculations to LCP's counsel. The updated information, however, was never provided to Defendants.

LCP's counsel acknowledges the error, and there is no dispute that he had an obligation to supplement under Rule 26(e), but failed to do so when he received Glassford's revised calculations in February 2025. [Dkt. 124.]

Defendants seek fees under Rule 37(c) or the court's inherent authority.[4] [Dkt. 128.] Rule 37(c)(1) provides that if a party fails to provide information or supplement information produced under Rule 26(a) or (e), the party may not use that information at a hearing or trial, unless the failure was substantially justified or is harmless, and the court may order payment of the reasonable expenses, including attorney's fees.

Sanctions under Rule 37(c) are "automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *Johnson v. C.R. Bard, Inc.*, 77 F.4th 641, 646 (7th Cir. 2023) ("Given that the text of Rule 37(c)(1) treats violations of 26(a) and 26(e) equally, we apply the same standards to a party's failure to supplement.") District courts have broad discretion in determining if a violation is either justified or harmless. *Id*. The following factors guide the analysis: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 417 (7th Cir. 2019).

Here, LCP does not argue that its violation was harmless, nor could it under the circumstances. Defendants expended time and effort issuing document requests and arranging for Glassford's deposition after receiving Exhibit 2 in January 2025, only to learn eight months later during Glassford's deposition that she had provided an updated document shortly after preparing Exhibit 2.

The failure to correct earlier also was not justified. In connection with a settlement conference in February 2025, Judge Gilbert informed the parties that Meitzler's counsel had questioned the accuracy of the calculations outlined in Exhibit 2. And LCP's counsel does not deny that he received corrected calculations from Glassford, which he inadvertently failed to forward to Defendants.

LCP's counsel argues that the error could have been easily corrected had Defendants simply requested a meet and confer "to address what appeared on its face to be an incorrect data set." [Dkt. 124 at 6-7.] The court does not agree that Defendants had an obligation to raise discrepancies with LCP if only as a matter of strategy. But even if it did agree, Judge Gilbert flagged the issue, so LCP had notice. And it had actual possession of the corrected calculations from Glassford.

---

[4] The court has the inherent authority to sanction a party for discovery abuses. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991*); S.E.C. v. First Choice Mgmt. Servs., Inc.*, 678 F.3d 538, 543 (7th Cir. 2012). Because Rule 37(c) provides a sufficient basis for sanctions, the court does not consider whether it could also invoke its inherent authority to dismiss the case with prejudice. See *Goodvine v. Carr*, 761 F. App'x 598, 602 (7th Cir. 2019) ("We ordinarily encourage reliance on a statute or rule before the invocation of inherent authority if the statute or rule adequately sanctions the conduct.")

Counsel also argues that the error was inadvertent and not done in bad faith. A showing of "willfulness, bad faith, or fault is necessary only when dismissal or default is imposed as a discovery sanction." *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642 (7th Cir. 2011); see *Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 208 (1958) ("Whatever its reasons, petitioner did not comply with the production order. Such reasons, and the willfulness or good faith of petitioner, can hardly affect the fact of noncompliance and are relevant only to the path which the District Court might follow in dealing with petitioner's failure to comply."). Here, Defendants seek attorney's fees.

Because of counsel's failure, Defendants are entitled to reasonable attorney's fees and costs that followed from its reliance on Exhibit 2, and reasonable attorney's fees and costs associated with preparing its Rule 37 sanctions motion. Defendants were prejudiced in that they expended time and effort preparing and seeking fact discovery based on the calculations outlined in the exhibit. Though Defendants may not have been totally surprised—they admit that they were "confident that they would be able to establish that Plaintiff failed to comply with its commission payment policy" based on the formula applied to Exhibit 2—this is but one consideration. [Dkt. 108 at 3.] And that Defendants read Exhibit 2 as a misapplication of Plaintiff's commission policy says nothing about whether LCP knew the calculations themselves were inaccurate.

Counsel's failure did not disrupt a trial or summary judgment briefing, nor is there any suggestion that counsel acted in bad faith or willfully. Still, counsel all but admits that he had every reason to question the accuracy of the calculations, first when Judge Gilbert flagged potential inaccuracies and second when Glassford forwarded the corrected calculations in February 2025. At the very least, counsel should have caught the error when preparing Glassford for her deposition in August 2025. And though the error was eventually corrected through a supplemental disclosure, this occurred long after the original disclosure and only during Glassford's deposition.

Defendants shall submit its reasonable attorney's fees and costs to LCP by a date the court separately sets and the parties are required to meet and confer in an effort to agree on the amount of payment.

## IV. Conclusions

For these reasons, the court denies Plaintiff's and Defendants' summary judgment motions. It grants Defendants' motion for sanctions.

Enter: 23-cv-10066
Date: March 2, 2026

_____
Lindsay C. Jenkins

14